Mary **LAWSON** and Matt
**Lawson, Plaintiffs,**

v.

**FLEET BANK OF MAINE, Defendant,**

v.

**FEDERAL DEPOSIT INSURANCE
CORPORATION, Third Party
Defendant.**

Mary **LAWSON** and Matt
**Lawson, Plaintiffs,**

v.

**FEDERAL DEPOSIT INSURANCE
CORPORATION, Defendant.**

**Civ. Nos. 92–123–P–C, 92–73–P–C.**

United States District Court,
D. Maine.

Nov. 3, 1992.

Barbara Appleby, Rufus Brown, Drummond, Woodsum, Plimpton & MacMahon, Portland, ME, for F.D.I.C.

William Robitzek, Berman & Simmons, Lewiston, ME, Raymond Fylstra, Joyce & Kubasiak, Chicago, IL, for Lawson.

Ben Zuckerman, Verrill & Dana, Portland, ME, for Fleet Bank.

## MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

Plaintiffs in these consolidated actions are holders of certificates of deposit (CDs) issued by Maine Savings Bank. Maine Savings Bank failed shortly after Plaintiffs purchased their CDs, and the Federal Deposit Insurance Corporation (FDIC) was named receiver on February 1, 1991. On the same date Maine Savings Bank's deposit liabilities were assumed by Fleet Bank from FDIC as receiver, and shortly thereafter, Fleet informed Plaintiffs of the assumption, giving them the option of retaining their CDs with Fleet at an interest rate lower than that offered by Maine Savings or of withdrawing their funds with accrued interest without the penalties usually attendant on such withdrawals. With these actions Plaintiffs [1] seek to recover compensatory damages equal to the difference in interest Maine Savings promised to pay and that actually paid to Plaintiffs by Fleet after it assumed Maine Savings Bank's deposit liabilities.

In the action brought against the FDIC, Plaintiffs assert that the FDIC illegally delegated the authority to reduce interest rates prior to maturity on the CDs it assumed as the receiver of Maine Savings. The FDIC denied Plaintiffs relief in administrative proceedings, and they now seek review of that administrative decision. The case against Fleet originated in the Maine state courts and alleges that Fleet, in assuming the deposit liabilities of Maine Savings, assumed the contractual liabilities as well, and thus owes Plaintiffs interest at the contractual rate. Fleet removed the case to Federal Court and impleaded the FDIC as Third–Party Defendant on an indemnification theory. The cases were consolidated here by agreement of the parties. Now before the Court are Fleet's motion for summary judgment (Docket No. 21) and the FDIC's motion to dismiss (Docket No. 29).

Although the standards for resolution of motions to dismiss and summary judgment motions are different, the operative undisputed facts on these motions are largely the same. On January 9, 1991, and January 22, 1991, Plaintiffs purchased five separate one-year CDs from Maine Savings, each in the amount of $92,256.03. The CDs each had an interest rate of 7.95% per year, and maturity value of $100,000. On February 1, 1991, Maine Savings Bank was declared insolvent by the Maine Superintendent of Banking and the FDIC was appointed as its Receiver. Also on February 1, 1991, the FDIC in both its corporate and receiver capacities, signed a purchase and assumption (P & A) agreement with Fleet Bank of Maine, under which Fleet acquired certain assets and assumed certain liabilities of Maine Savings.

Section 2.1 of the P & A provides:

2.1 *Liabilities Assumed by Assuming Bank.* The Assuming Bank hereby expressly assumes at Book Value and agrees to pay, perform, and discharge all of the following liabilities of the Failed Bank as of Bank Closing, except as otherwise provided in this Agreement (such liabilities hereinafter referred to as "Liabilities Assumed"):

(a) demand Deposits, including outstanding cashier's checks and other official

---

[1] Plaintiffs have moved in both actions to certify a class of all holders of Maine Savings CDs whose rates were reduced by Fleet after the Maine Savings failure. By order of May 21, 1992, the Court deferred ruling on the motion for class certification until after its determination of the dispositive motions. On that same date the Court also granted Defendant's Motion to Stay Discovery. Plaintiff has moved for reconsideration of those orders, and that motion is hereby DENIED.

The basis for Plaintiffs' motion is that the Court in issuing its order on May 21 failed to consider Plaintiffs' response to the motions, which was filed on May 22, under the terms of an extension of time granted by the Court. As a substantive matter in these cases, however, even after having read Plaintiffs' May 22 memorandum, the Court believes that its decision to defer action on the class certification motion and to stay discovery until after resolution of the dispositive motions was the more prudent use of judicial resources. That judgment has been borne out by the outcome here.

checks, and time and savings Deposits, including without limitation those Deposits listed in Schedule 2.1 attached hereto and incorporated herein.

Section 2.2 treats the interest on deposit liabilities separately:

*Interest on Deposit Liabilities Assumed.* The Assuming Bank agrees that, from and after Bank Closing, it will accrue and pay interest on Deposit liabilities assumed pursuant to Section 2.1 in accordance with the terms of the respective deposit agreements between the failed Bank and the depositors of the Failed Bank for a period of fourteen (14) days commencing the day after Bank Closing. Thereafter, the Assuming Bank may pay interest with respect to such Deposit liabilities at rate(s) it shall determine; *provided, that* such rate(s) shall not be less than the rate of interest the Assuming Bank pays with respect to passbook savings Deposit accounts. The Assuming Bank shall permit each such depositor to withdraw, without penalty for early withdrawal, all or any portion of such depositor's Deposit, whether or not the Assuming Bank elects to pay interest in accordance with such deposit agreement; *provided, that* if such Deposit has been pledged to secure an obligation of the depositor to the Failed Bank, any withdrawal thereof shall be subject to the terms of the agreement governing such pledge. The Assuming Bank shall give notice to such depositors as provided in Section 5.3 of the rate(s) of interest which it has determined to pay after such fourteen (14)–day period, and of such withdrawal rights.

Section 2.2 of the agreement is referenced again in section 5.2, which provides:

5.2 *Deposit Agreements.* Subject to the provisions of Section 2.2, the Assuming Bank agrees to honor the terms and conditions of each written agreement with respect to each Deposit account transferred to the Failed Bank pursuant to this Agreement, including but not limited to escrow and mortgage servicing agreements.

On February 13, 1991, Fleet Bank notified Plaintiffs that it had assumed Maine Savings Bank's deposit accounts. The notice informed Plaintiffs that those accounts would continue to accrue interest at the rate contracted for with Maine Savings until February 22, 1991. After that date, however, the interest rate would be that set forth on an enclosed schedule. For CDs like Plaintiffs', the new interest rate would be 6.125%, for an effective yield of 2.077% per year less than that contracted for with Maine Savings.

The notice also informed Plaintiffs that they could withdraw their funds without penalty, and they did so on February 23, 1991. They reinvested the principal and interest accrued to that date in CDs offered by another bank at 7.35% per year.

Following the requirements of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. § 1821(d)(3), Plaintiffs filed a Proof of Claim with the FDIC as receiver. Their claim was denied on October 22, 1991. Plaintiffs then filed a request for administrative review under 12 U.S.C. § 1821(d)(7), and the FDIC refused to review the denial.

*Motion for Summary Judgment*

The complaint filed against Defendant Fleet alleges that by assuming the deposit liabilities of Maine Savings, Fleet assumed the responsibility of paying Plaintiffs' CDs at the rate agreed upon by Plaintiffs and Maine Savings. Thus, Plaintiffs allege, Fleet's reduction of the interest rates on the CDs constitutes a breach of contract. Defendants argue on this motion for summary judgment that their only obligation was to pay interest at the rate fixed by Maine Savings for a period of fourteen days and that, having done so, they have not breached any obligation to the Plaintiffs.

A motion for summary judgment must be granted if:

[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). As the Court of Appeals for the First Circuit has recently stated: "To survive summary judgment, [the non-moving party] must ... show[ ] that there [is] sufficient evidence such that 'a reasonable jury could, on the basis of the proffered proof, return a verdict' in its favor." *Media Duplication Services, Ltd. v. HDG Software, Inc.*, 928 F.2d 1228, 1240 (1st Cir.1991) (*quoting Brennan v. Hendrigan*, 888 F.2d 189 (1st Cir.1989)).

In *Timberland Design, Inc. v. First Service Bank for Savings*, 932 F.2d 46, 48 (1st Cir.1991), the Court of Appeals for the First Circuit explained that under the Financial Institutions Reform, Recovery and Enforcement Act of 1989, the FDIC has two primary options when a bank fails: to liquidate it or to sell the bank's healthy assets to another bank by means of a P & A agreement under which the purchasing bank agrees to pay the failed bank's depositors. The P & A agreement is the favored option because it better maintains confidence in the banking system and because it more expeditiously provides for the return of funds to the failed bank's depositors. *Id.* The court also noted that "[g]enerally, the purchase and assumption must be executed in great haste, often overnight."

In this case, the same day the FDIC was appointed receiver of Maine Savings, it chose the preferred option of entering into a P & A agreement with Fleet. As the court pointed out in *Payne v. Security Savings and Loan Association, F.A.*, 924 F.2d 109, 111 (7th Cir.1991), FIRREA contemplates that the FDIC will determine which assets and liabilities of a failed bank should be sold and transferred and which it should keep.[2] As the court in *Payne* explained:

> This design facilitates the sale of a failed institution's assets (and thus helps mini-

mize the government's financial exposure) by allowing the [FDIC] to absorb liabilities itself and guarantee potential purchasers that the assets they buy are not encumbered by additional financial obligations.

*Id.* at 111.

Plaintiffs have alleged no basis for any potential liability of Fleet to them other than that engendered by the P & A agreement. Any obligation of Fleet to Plaintiffs must, therefore, be determined by the terms of that P & A agreement. The Court is satisfied from the plain language of the document that neither the FDIC nor Fleet intended that the interest obligations of Maine Savings on Plaintiffs' CDs would pass to Fleet under the agreement. Under section 2.1 of the agreement, Fleet "expressly assumes" Maine Savings Bank's time deposits at "Book Value." CDs with a one year term are obviously time deposits. Book Value is defined in pertinent part in Appendix I to the agreement as

> the dollar amount stated on the accounting records of the Failed Bank as of Bank Closing ... after adjustments made by the Receiver for differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections. Without limiting the generality of the foregoing, (i) *the Book Value of a liability shall include all accrued and unpaid interest thereon as of Bank Closing....* (Emphasis added).

In the Court's view, section 2.1 and the definition of book value clearly spell out what Fleet assumed as deposit liabilities of Maine Savings. If it were not clear from those sections, however, it becomes so when the Court examines the rest of the agreement. In section 2.2, Fleet makes a specific agreement to pay interest on the deposit liabilities at the contract rate for a

---

**2.** Although *Payne* dealt with the Resolution Trust Corporation's authority under 12 U.S.C. § 1821((d)(2)(F) to organize thrift associations "to take over such liabilities as the Corporation may deem appropriate," the FDIC clearly has the same broad discretion when deciding to transfer "*any*" asset or liability of the institution

in default." 12 U.S.C. § 1821(d)(2)(G). This is made clear in § 1823(c)(2)(A), which provides the FDIC with broad discretionary powers, *inter alia*, "to facilitate ... the assumption of any or all of such insured depository institution's liabilities by an insured institution."

period of two weeks commencing the day after the closing of Maine Savings. The separate agreement to pay interest makes plain that no future interest obligations were *assumed* in the general assumption of deposit liabilities in section 2.1. Section 5.2 further illustrates the limitations inherent in Fleet's assumption of deposit liabilities. In that section Fleet agrees to honor the terms and conditions of written agreements concerning deposit accounts, but specifically excepts interest obligations, which are dealt with in section 2.2.

■ Plaintiffs resist the clear language of the P & A agreement. They argue that because deposit liabilities exist only by contract, the FDIC cannot have transferred the deposit liabilities without transferring the contractual obligations as well. They further argue that the CDs are indivisible contracts which can only be transferred in gross. They also argue that the FDIC had no authority to authorize Fleet to repudiate the Maine Savings CD contracts. Plaintiffs' arguments are without merit. The P & A agreement is a contract between the FDIC and Fleet and, under the federal common law of contracts, which is to govern here, *see* P & A Agreement § 16.4,[3] it will be enforced to give effect to their intentions. *See Hollerbach v. United States*, 233 U.S. 165, 171, 34 S.Ct. 553, 555, 58 L.Ed. 898 (1914); *United States v. Seckinger*, 397 U.S. 203, 212, 90 S.Ct. 880, 885, 25 L.Ed.2d 224 (1970). The clear intent of the P & A agreement was to treat the deposit liabilities and the interest liabilities attendant to the deposits separately, with Fleet assuming the latter only in the limited fashion described above. The Court should not and will not rewrite the contract to effect a transfer desired by Plaintiffs but quite explicitly not intended by the parties to the contract. *See Fowler v. Boise Cascade*, 948 F.2d 49, 56 (1st Cir. 1991) (applying Maine law).

Plaintiffs point to the severability clause of the P & A agreement, set forth in section 16.11. It provides that "[i]f any provision of this Agreement is invalid or unenforceable then, *to the extent possible,* all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties hereto." (Emphasis added). Here, however, it is not possible to sever section 2.2 and the portion of section 5.2 referring to it, the provisions regarding assumptions of interest, and still give effect to the parties' intentions. All of the provisions of the agreement read together demonstrate that the term "deposit liabilities" as understood by the parties means something distinct from future interest accruals.

■ Plaintiffs also argue that in section 6.1(a)(i) of the P & A agreement Fleet accepted an explicit assignment of Maine Savings Bank's contracts and thus contract liabilities. The Court disagrees. Section 6.1(a)(i) discusses the transfer of *records pertaining to* deposit liabilities of the failed bank. Included among the records the FDIC agreed to transfer are signature cards, orders, and contracts between the failed bank and its depositors. Section 6.1(a)(i) is plainly transferring any documentary evidence of the obligations that are transferred elsewhere in the P & A agreement, and not the obligations themselves. This is made explicit not only by the express treatment of assumption of obligations, but also in Appendix I where records are defined as "all documents, microfiche, microfilm, and computer records ... of the Failed Bank...."

■ The Court finds the language of the P & A agreement clear and unambiguous in its description of the nature of the deposit liabilities transferred to Fleet by the FDIC.[4] These do not include future interest obligations past the date of closing except to the extent specifically spelled out.

---

**3.** If no federal law exists, then Maine law is to govern. P & A Agreement § 16.4

**4.** Under the federal law of contracts, the Court must view a contract in its entirety and give effect to unambiguous language. *Tackitt v. Prudential Ins. Co., Special Agents Mutual Benefit*

*Assn., Inc.,* 758 F.2d 1572, 1575 (11th Cir.1985). The Court must not artificially create ambiguity where none exists. *Hammond v. Fidelity & Guaranty Life Ins. Co.,* 965 F.2d 428, 430 (7th Cir.1992).

If, however, the agreement were somehow to be viewed as ambiguous, the intent of both the parties to the P & A agreement that Fleet would assume the deposit liabilities of Maine Savings without assuming the full contractual obligations associated with those deposit liabilities is undisputed on the record before the Court. In his affidavit, Robert Nellson, Fleet's Vice-President in charge of the P & A agreement, so stated Fleet's intention. Nellson Affidavit, ¶ 8. The FDIC's counsel has also represented to the Court the FDIC's identical understanding of what it intended to convey in the the agreement. FDIC's Memorandum in Support of its Motion to Dismiss, at 24.

Because Fleet did not, under the P & A agreement, assume from the FDIC the contractual interest rate obligations incurred by Maine Savings on Plaintiffs' CDs, Fleet has not breached any contract by failing to pay the contract rate. Fleet is, therefore, entitled to summary judgment on its motion. Since the interest obligations which Plaintiffs seek to enforce were not transferred to Fleet, the Court must now examine the relationship of Plaintiffs, Maine Savings, and the FDIC to see if the FDIC is obligated to pay the contractual interest which Plaintiffs seek.

### Motion to Dismiss

Plaintiffs argue that the interest obligation on the CDs was either transferred under the P & A agreement or retained by the FDIC. The FDIC argues, however, that the interest obligation ceased to exist at the time Maine Savings became insolvent, and that it therefore has no liability to Plaintiffs.

The FDIC in this case has acted both in its corporate capacity and in that of receiver for Maine Savings. As an insurer, the FDIC was required by section 1821(f) of FIRREA to pay the insured deposits, either by cash or by transferring the amount of the insured deposits to another bank. The

FDIC performed this function by means of the P & A agreement, paying Plaintiffs' deposits by transferring them to Fleet. The regulations accompanying FIRREA provide specifically for determining the amount of an insured deposit:

> (1) General rule. The amount of a deposit is the balance of principal and interest unconditionally credited to the deposit account as of the date of default of the insured depository institution plus the ascertainable amount of interest *to that date,* accrued at the contract rate (or the anticipated or announced interest or dividend rate) which the insured depository institution in default would have paid if the deposit had matured on that date and the insured depository institution had not failed.

12 C.F.R. § 330.3(i)(1) (1992) (emphasis added). The amount transferred more than complied with the regulation so Plaintiffs plainly have no dispute with the FDIC as insurer.[5]

Plaintiffs assert, however, that they have a further claim against the FDIC either as receiver or in its corporate capacity for the contractual interest which was not paid under the P & A Agreement. The Court is satisfied not only that the amount provided to Plaintiffs through operation of the P & A agreement was appropriate, but also that they have no further claim. Section 1821(i) of title 12 provides for valuation of the claims of creditors whether the Corporation has acted under section 1823(c) which permits purchase and assumption agreements, or otherwise. Section 1821(i)(2) provides:

> The maximum liability of the Corporation, acting *as receiver or in any other capacity,* to any person having a claim against the receiver or the insured depository institution for which such receiver is appointed shall equal the amount such claimant would have received if the Corporation had liquidated the assets and

---

5. Plaintiffs do not claim that their dispute concerns the insured deposits, and this Court would not have jurisdiction to review a final determination of the FDIC concerning its payment of insured deposits. 12 U.S.C. § 1821(f)(4); *Ni-*

*mon v. Resolution Trust Corp.,* 975 F.2d 240 (5th Cir.1992). It is important, however, to delineate the functions of the FDIC under FIRREA and how it has performed them.

liabilities of such institution without exercising the Corporation's authority under subsection (n) of this section or section 13 [12 U.S.C. § 1823]. (Emphasis added).

If Maine Savings had been liquidated, the FDIC would have closed it, sold its assets, and paid Plaintiffs and other depositors their insured amounts, covering any deficiency with insurance funds. *See Texas American Bancshares, Inc. v. Clarke*, 954 F.2d 329, 333 (5th Cir.1992). As was demonstrated above, the amount of the deposit Plaintiffs would have received in liquidation included interest at the contract rate only to the date of Maine Savings Bank's insolvency. Since Plaintiffs have already received as much as they would have in a liquidation proceeding, they have no further claim against the FDIC as receiver.[6]

The FDIC argues that even if its obligation to pay Plaintiffs' claim were not limited by statute, under general principles of receivership law, its obligation to pay interest at the contract rate ceased at the date of the closing of Maine Savings Bank. The Court of Appeals for the First Circuit long ago stated that when a claim is established against an insolvent national bank,[7] "it must be the amount due and owing at the time of the declaration of insolvency, as of which time it is entitled, with the claims of the other creditors, to a ratable distribution of the assets of the bank." *Kennedy v. Boston–Continental National Bank*, 84 F.2d 592, 597 (1st Cir.1936). The amount due and owing here at the time of insolvency was Plaintiffs' deposit and interest accrued to that date, not the deposit plus accrued and future interest.

Both Plaintiffs and Defendant rely on *First Empire Bank–New York v. Federal Deposit Insurance Corp.*, 572 F.2d 1361 (9th Cir.1978) and its sequel, *First Empire Bank–New York v. Federal Deposit Insurance Corp.*, 634 F.2d 1222 (9th Cir.1980) for their respective arguments that a ratable distribution has or has not been made to Plaintiffs under section 194 of the National Bank Act.[8] It appears, however, that *First Empire* and its progeny explicating the National Bank Act's requirement of a ratable distribution to creditors of a failed bank have been overruled by section 1821(i) of FIRREA. *See, e.g., MCorp v. Clarke*, 755 F.Supp. 1402, 1418 (N.D.Tex. 1991); *Senior Unsecured Creditors' Committee v. FDIC*, 749 F.Supp. 758, 763 (N.D.Tex.1990); *see also, Texas American Bancshares, Inc. v. Clarke*, 954 F.2d at 340 (deciding not to address retroactivity of § 1821 but distinguishing *First Empire* and finding that result would be the same under pre-FIRREA law or under FIRREA on facts presented); *compare* House Rep. No. 101–222, *reprinted in* 1989 U.S.Code Cong. & Admin.News 86, 432, 436 (current law is "clarified").

In any event, it is clear under prior law that Plaintiffs received a ratable distribu-

---

**6.** Plaintiffs argue that § 1821(i)(2) could not limit the FDIC's liability to pay the interest through the P & A agreement because creditors routinely do receive more under a P & A agreement than they do in a liquidation. As the very next subsection of the statute makes clear, the FDIC may *in its discretion* decide to make additional payments to certain claimants. 12 U.S.C. § 1821(i)(3). This does not change the limitation of liability imposed in subsection 1821(i)(2), however.

**7.** Although Maine Savings is not a national bank, under Maine law when the Superintendent of Banking appoints the FDIC as receiver of a failed Maine bank, federal law prescribes the procedures that the FDIC shall follow. 9–B M.R.S.A. § 365(10).

**8.** In *First Empire Bank*, the FDIC, as receiver for an insolvent national bank, had entered into a purchase and assumption agreement under which some, but not all, of the assets of and claims against the failed bank were assumed. The suit was brought by holders of standby letters of credit which had not been assumed. They contended that the assumption, which would pay the assumed claims in full, amounted to a distribution of the funds of the failed bank in which they were entitled to share ratably under the National Bank Act.

The court agreed, holding that a purchase and assumption agreement providing 100% to assumed creditors and less to unassumed creditors violated the National Bank Act. The Court stated that if certain creditors' debts were not assumed, "[the FDIC] must ... stand ready to render the distribution ratable." *First Empire–N.Y.*, 572 F.2d at 1371. The Court, however, acknowledged the rule that interest accruing after insolvency is to be disallowed if a distribution is to be truly ratable.

**144**

tion after the insolvency. In the second *First Empire* case the court explained that "the benefit-of-the bargain rule, although appropriate in other circumstances, can have no application in the event of the failure of a national bank. With different contract rates applying to different claims, the benefit-of-the-bargain rule would result in a decidedly unratable distribution as between disfavored creditors." *First Empire Bank–N.Y. v. FDIC*, 634 F.2d at 1224. The court expressly adopted the reasoning of the court in *Elliott v. First Inland National Bank*, 32 F.Supp 839 (D.Or.1940), which addressed the rule in the context of time deposits like those at issue here: " '[I]nterest on the time and savings deposits should be computed to the date of closing at the contract rate ... thereafter the total should bear interest at the same rate (the local statutory rate on judgments) as the demand deposits. Ratability in distribution is thus attained.' " *First Empire–N.Y.*, 634 F.2d at 1225.

Because Plaintiffs have received slightly more than the maximum amount which the FDIC was obligated to pay on their claim under section 1821(i), they cannot state a further claim against the FDIC for interest on their CDs at the contract rate past the date of Maine Savings' insolvency. The FDIC's motion to dismiss should, therefore, be granted.

Accordingly, it is ORDERED that Defendant Fleet's motion for summary judgment be, and it is hereby, GRANTED. It is FURTHER ORDERED that Defendant FDIC's motion to dismiss be, and it is hereby, GRANTED.

SO ORDERED.