**CITY AND SUBURBAN MANAGEMENT CORPORATION, Plaintiff,**

v.

**FIRST BANK OF RICHMOND and Bank Services, Inc., Defendants.**

**Civil Action No. 94–506–LON.**

United States District Court, D. Delaware.

March 19, 1997.

Allen M. Terrell, Jr., Frederick L. Cottrell, III, Richards, Layton & Finger, Wilmington,

DE, for Plaintiff; Edgar M. Whiting, III, Stryker, Tams & Dill, Newark, NJ, of counsel.

Robert G. Carey, Wilmington, DE, for Defendants; Joseph E. Altomare, Titusville, PA, of counsel.

## *OPINION*

LONGOBARDI, District Judge.

On October 11, 1994, City and Suburban Management Corporation ("City & Suburban") filed a complaint against First Bank of Richmond ("First Richmond") and Bank Services, Inc. ("BSI"), alleging that First Richmond and BSI breached certain loan participation and servicing agreements ("Participation Agreements"), negligently performed their servicing obligations under the Participation Agreements, breached fiduciary obligations to Plaintiff, and converted funds to which Plaintiff is entitled. Currently pending before the Court is Plaintiff's Motion for Partial Summary Judgment (Docket Item "D.I." 32).

### I.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine only if a reasonable jury could find for the nonmoving party. *Id.* Credibility determinations are not the function of the judge; rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct.

at 2513. Rule 56(c) of the Federal Rules of Civil Procedure provides that "summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to damages."

### II.

Although City & Suburban, First Richmond, and BSI are the litigants involved in this contract action, the rights and responsibilities at issue arose before these parties had any stake in the Participation Agreements. From 1988 through 1991 First American Capital Bank, N.A. ("First American"), a California securities firm, entered into various loan participation and servicing agreements. Eleven of those agreements are the Participation Agreements at issue in this case. The Participation Agreements involved the purchase and servicing of FHA-insured Title I mortgage loans.[1] As part of these contracts, First American assumed certain servicing obligations.

The First State Bank of Lamoure was one of the original entities with whom First American contracted. On October 13, 1992, The First State Bank of Lamoure assigned its interest in the Participation Agreements to City & Suburban Federal Savings Bank, Plaintiff's parent company. On December 1, 1992, that interest was transferred to Plaintiff.

In the Participation Agreements, First American agreed to service and administer the Title I mortgage loans. As the "Seller/Servicer" or the "Company" under the Participation Agreements, First American was required, among other things, to collect and remit principal and interest payments, to collect insurance proceeds, and to foreclose upon default if necessary.

Two sections of the Participation Agreements which set forth some of these servic-

---

1. Under Title I, the FHA insures qualified lending institutions against loss on eligible loans. The lender is at risk for 10% of the principal balance of each loan before an insurance claim will be paid by the FHA. The FHA insures the remaining 90% of the principal balance of each loan subject to the limits of the lender's insurance reserve account with the Department of

Housing and Urban Development. A lender therefore risks the loss of up to 10% of the principal balance of each loan submitted to the FHA for an insurance claim, plus a portion of the interest on such loans. If the limits of a lender's insurance reserve account have been exhausted, the lender could be required to pay even more.

ing obligations are particularly relevant to the pending motion. Section 5.2(a) of the Participation Agreements provides in relevant part:

> If, at a time when the Company has amounts available in its Reserve Account, any payment due under any Mortgage Loan remains delinquent for a period of 90 days, the Company shall no later than such 90th day, either (i) initiate a claim for reimbursement for loss on such Mortgage Loan with the FHA pursuant to 24 C.F.R. § 201.54 and Title I or (ii) repurchase the Class A Participation Interest in such Mortgage Loan. . . .

(D.I. 35, Exhibit C).

The other pertinent provision of the Participation Agreements is Section 6.3:

> Section 6.3 *Subordination Advances by the Company*
>
> (a) On any Remittance Date as of which a payment of interest not allocable to the period before the Cut Off Date (adjusted to the Pass–Through Rate) which was due on a Mortgage Loan is delinquent, the Company shall advance to the Class A Certificateholders through the Certificate Account, from amounts otherwise deductible from the Certificate Account to Class B Certificate holders, or if such amounts are insufficient therefor from its own funds, 90% of such delinquent amounts, subjection [sic] to Section 6.3(b).
>
> (b) The Company shall not be obligated to effect any Subordinated Advance to the extent (i) that the Company has initiated a claim for reimbursement from the FHA on the related Mortgage Loan and such claim has not been rejected by the FHA, (ii) that the Mortgage Loan has been repurchased pursuant to Section 2.5, 3.2 or 5.2, or (iii) that the total unreimbursed Subordinated Advances with respect to the relevant Mortgage Loan equals or exceeds an amount equal to 90% of the scheduled interest for 90 days on such Mortgage Loan (adjusted to the Pass–Through Rate).

(D.I. 35, Exhibit C).

On March 4, 1993, First American was closed by the Comptroller of the currency, and the FDIC was appointed as its Receiver.

On May 24, 1993, through a written Agreement ("Loan Sale Agreement"), the FDIC conveyed to First Richmond all of First American's right, title and interest in and to each of the mortgage loans involved in the Participation Agreements. First Richmond simultaneously subcontracted with BSI to perform all of its servicing obligations under the Participation Agreements. The transfer from the FDIC to First Richmond was accomplished in the Loan Sale Agreement. (D.I. 35, Exhibit G).

Under Section 2.2(1) of the Loan Sale Agreement, the FDIC conveyed to First Richmond all of the Seller's interest in and to the mortgage loans "together with and subject to all of Seller's rights and duties in respect of each of the Loans arising under or by reason of any or all of [the Participation Agreements], including without limitation, the rights and duties related to the servicing of the Loans (collectively, the 'Servicing Rights')." (D.I. 35, Exhibit G). Section 2.2(2) of the Loan Sale Agreement continues that: "[First Richmond] agrees to purchase, accept and assume the foregoing; and to be bound by and faithfully and timely to perform all of Seller's obligations arising out of or related to the Participation Agreements." (D.I. 35, Exhibit G).

In its motion for partial summary judgment, Plaintiff asks this Court to find that First Richmond breached its obligation to make "subordinated advances" under the Participation Agreements and that First Richmond improperly failed to submit claims on certain of the underlying mortgage loans to the FHA against its insurance reserve account.

First Richmond does not dispute that the Participation Agreements require the Seller/Servicer to make subordinated advances. Moreover, First Richmond admits that it did not make subordinated advances. First Richmond argues, instead, that when First Richmond obtained its interest in the Participation Agreements from the Federal Deposit Insurance Corporation ("FDIC"), First Richmond and the FDIC did not intend for First Richmond to assume the obligations to make subordinated advances or claims against its insurance reserves. The core of

First Richmond's contentions is expressed in the following excerpt from its Memorandum of Law:

> The ultimate fact question in this case therefore becomes what was intended by the parties to the Loan Sale Agreement. Notwithstanding that there is no express limitation of the assumption of obligations contained in the [Loan Sale] Agreement, if there is no disagreement between FDIC and First Bank Richmond that the latter was never expected to make subordinated advances nor claims against insurance reserves, Plaintiff's Motion must fail. In this regard it is of no moment that the language is not ambiguous or that in any contest between the FDIC and First Bank Richmond the FDIC would be entitled to rely upon the unambiguous language to its own advantage. Clearly Plaintiffs cannot inasmuch as they are not a party to the contract.

(D.I. 36 at 5). The disagreement between the parties essentially turns on the proper interpretation of the Loan Sale Agreement. First Richmond does also, however, argue that state contract law has been preempted by federal statute.

### III.

■ Initially, this Court must determine what law to apply to the interpretation of the Loan Sale Agreement. The Loan Sale Agreement contains a choice of law provision in Section 5.9, which provides in relevant part:

> This Agreement shall be controlled by federal law. To the extent not controlled by federal law, this Agreement shall be governed by and construed and enforced in accordance with the laws of the State of California.

(D.I. 35, Exhibit G). In an Order dated October 17, 1995, however, this Court ruled that "[t]he parties have stipulated, and the court now holds, that California law applies

to the contract claims in this action." (D.I.21).

The law of the case doctrine provides that when a court decides a rule of law, that rule should govern the remainder of the litigation. *Matter of Resyn Corp.*, 945 F.2d 1279, 1281 (3d Cir.1991).[2] Neither party has urged this Court to exercise its discretion to disturb the stipulation of the parties and this Court's Order on the choice of law issue. Because the United States is not a party to this action, and the parties are in federal court under this Court's diversity jurisdiction, this Court will not disturb the stipulation and Order. In any event, there is Supreme Court precedent that would support applying state law to the contract issues in this case. *See Miree v. DeKalb County, Georgia*, 433 U.S. 25, 28–33, 97 S.Ct. 2490, 2493–96, 53 L.Ed.2d 557 (1977) (state law applies to question of whether private parties may, as third party beneficiaries, sue a municipality for breach of FAA contracts); *Bank of America Nat'l Trust & Savs. Ass'n v. Parnell*, 352 U.S. 29, 32–34, 77 S.Ct. 119, 120–22, 1 L.Ed.2d 93 (1956) (state law applies when case among private parties is based on diversity jurisdiction but involves federal commercial paper); *cf. Boyle v. United Techs. Corp.*, 487 U.S. 500, 512, 108 S.Ct. 2510, 2518–19, 101 L.Ed.2d 442 (1988) (federal law applied to whether government contractor was liable for design defects in military equipment because state law presented a significant conflict with federal policy).[3]

### IV.

First Richmond argues that because City & Suburban was not a party to the Loan Sale Agreement, it may not "rely upon the unambiguous language to its own advantage." (D.I. 36 at 5). At the same time, First Richmond seems to argue that, despite the unambiguous language of the contract to the contrary, there is no disagreement between the FDIC and First Richmond that First

---

**2.** There are three primary exceptions to this rule: (1) when the right to move for reconsideration would be effectively denied; (2) when new evidence is available; and (3) when there has been a supervening rule of law. *Schultz v. Onan Corp.*, 737 F.2d 339, 345 (3d Cir.1984) (quoting

*Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169–70 (3d Cir.1982)).

**3.** If this Court were to apply the federal common law of contracts, the outcome of this motion would not change.

Richmond was not expected to make subordinated advances or claims against insurance reserves. (D.I. 36 at 5). A fair reading of First Richmond's position is that although the language of the Loan Sale Agreement unambiguously requires First Richmond to make subordinated advances and claims against its insurance reserves, various extrinsic evidence demonstrates a contrary intent, and that because City & Suburban was not a party to the Loan and Sale Agreement, it cannot rely on the unambiguous language of the contract to its benefit.

■■■ First Richmond is wrong when it argues that City & Suburban cannot avail itself of the unambiguous language of the Loan Sale Agreement because City & Suburban was not a party to the Loan Sale Agreement. Under a California statute, "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Cal.Civ.Code § 1559. The California statute codifies the general proposition of law that intended beneficiaries of a contract can enforce contractual obligations made by others for their benefit. There are two types of intended beneficiaries: creditor beneficiaries and donee beneficiaries. *Outdoor Servs., Inc. v. Pabagold. Inc.*, 185 Cal.App.3d 676, 230 Cal.Rptr. 73, 76 (1986). To be a creditor beneficiary the promisor's performance of the contract must discharge some form of legal duty owed to the beneficiary by the promisee. *Id.* First Richmond concedes that through its contract with the FDIC it became obligated to perform at least some servicing obligations that had been owed by the FDIC (as receiver) to City & Suburban. City & Suburban is, therefore, a creditor beneficiary.

■■■ First Richmond's position that the unambiguous language of the Loan Sale Agreement is displaced by correspondence and telephone conversations between the FDIC and First Richmond which show a contrary intent must fail as a matter of California contract law. A seminal opinion by Chief Justice Traynor established the basic California rule on contract interpretation:

In this state ... the intention of the parties as expressed in the contract is the source of contractual rights and duties. A court must ascertain and give effect to this intention by determining what the parties meant by the words they used. Accordingly, the exclusion of relevant, extrinsic evidence to explain the meaning of a written instrument could be justified only if it were feasible to determine the meaning the parties gave to the words from the instrument alone.

*Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641, 644 (1968). The court further explained that rational interpretation of the words of a contract require at least a preliminary consideration of all credible evidence, including extrinsic evidence, offered to prove the intention of the parties. *Id.* 69 Cal.Rptr. at 565, 442 P.2d at 645. If, after this preliminary consideration, the court decides that the language of a contract is fairly susceptible of either one of two asserted interpretations, then extrinsic evidence is admissible to prove either of the asserted meanings. *Id.* 69 Cal.Rptr. at 566, 442 P.2d at 646. The rule allowing testimony to explain an ambiguity in a contract may not be used to show that the parties meant something other than what they said, but only to explain what they meant by what they said. *Sass v. Hank,* 108 Cal.App.2d 207, 238 P.2d 652, 657 (1951) (quoting *United Iron Works v. Outer Harbor Dock & Wharf Co.*, 168 Cal. 81, 141 P. 917, 920 (1914)).

California courts occasionally utilize a tripartite framework for analyzing contractual language: "(1) What is the construction of the contract urged by the proponent of the parol evidence? (2) Is the contract reasonably susceptible to this construction? (3) If so, did the parties intend this construction?" *See, e.g., Consolidated World Investments, Inc., v. Lido Preferred Ltd.,* 9 Cal.App.4th 373, 11 Cal.Rptr.2d 524, 527 (1992).

In the present case, First Richmond argues that the parties to the Loan Sale Agreement did not intend to require First Richmond to make subordinated advances or claims against its insurance reserves. Our protocol, therefore, requires us to determine whether the contract is reasonably susceptible to this construction. In the Loan Sale

Agreement, the FDIC transferred the mortgage loans "together with and subject to all of Seller's rights and duties in respect of each of the Loans arising under or by reason of any or all of [the Participation Agreements], including without limitation, the rights and duties related to the servicing of the Loans (collectively, the 'Servicing Rights')." Also in the Loan Sale Agreement, First Richmond agreed "to be bound by and faithfully and timely to perform all of Seller's obligations related to the Participation Agreements." Loan Sale Agreement, § 2.2(2). It is undisputed that the duties to make subordinated advances and claims against insurance reserves are part of the duties related to the servicing of the loans under the Participation Agreements.

First Richmond has submitted extrinsic evidence which it claims shows that the FDIC and First Richmond did not intend for First Richmond to make subordinated advances and claims against its insurance reserves. This extrinsic evidence hardly merits discussion.[4] It consists of hearsay, speculation by officers and agents of the defendants, and irrelevant material that does not serve to establish the intent of the parties. There is absolutely no competent evidence that the agreement means anything other than what it says on its face: the FDIC transferred "all of Seller's rights and duties in respect of each of the Loans" arising under the Participation Agreements "including without limitation, the rights and

duties related to the servicing of the Loans." (D.I. 35, Exhibit G).

Thus, this Court concludes that the Loan Sale Agreement is not reasonably susceptible to various interpretations. Indeed, Plaintiff practically concedes as much when it calls the language of the contract "unambiguous." Consequently, Defendant is contractually obligated to make subordinated advances under the Participation Agreements and to submit claims on certain of the underlying mortgage loans to the FHA against its insurance reserve account.

## V.

■ First Richmond also argues, however, that its contractual obligation has been preempted by the Financial Institution Reform Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821, et seq. In particular, First Richmond argues that this case is "controlled by" Section 1821(i)(2) of FIRREA which provides as follows:

> The maximum liability of the Corporation, acting as receiver or in any other capacity, to any person having a claim against the receiver or the insured depository institution for which such receiver is appointed shall equal the amount such claimant would have received if the Corporation had liquidated the assets and liabilities of such institution without exercising the Corpora-

---

4. One example is illuminating. First Richmond stated in its Memorandum of Law that "Plaintiff themselves [sic] signed a waiver of their right to enforce § 9.4 of the Participation Agreement (a provision which *inter alia* required any successor servicer to assume all of the liabilities of the failed Bank without modification). See Dowling Certification Exhibit 'B'." (D.I. 36 at 6). When Exhibit "B" is examined, however, it stands for a proposition completely different from that for which it was cited by First Richmond. Exhibit "B" is a letter from the FDIC to City & Suburban, in which the FDIC explains that because "the FDIC is not in the business of owning and servicing assets" it is "desirous of selling all of its rights under the agreement in as expeditious a manner as possible." To accomplish this goal, the FDIC asked City & Suburban to waive certain of its rights under Section 9.4 of the Participation Agreements. Under Section 9.4, the servicing rights could not be assigned without giving City & Suburban 45 days notice, and

after that period, City & Suburban had "a 30 day right to require the Bank to assign such servicing rights to a person selected by you and a majority of the other certificateholders." The FDIC requested City & Suburban to waive those specific provisions "in order that the FDIC can aggressively commence marketing the servicing functions as well as its remaining ownership in the pool of loans being serviced." City & Suburban then consented to the waiver of Section 9.4 as provided for above.

Rather than supporting Plaintiff's argument regarding the intention of the parties, this letter substantially undermines Plaintiff's position. It is obvious from the text of the letter that the FDIC was seeking to transfer all of the rights and liabilities, including the servicing functions, of the Participation Agreements as soon as possible. The FDIC accomplished that objective when it executed the Loan Sale Agreement with First Richmond.

tion's authority under subsection (n) of this section or section 1823 of this title.

12 U.S.C. § 1821(i)(2).

The statute, by its terms, applies only to the liability of "the Corporation," i.e. the FDIC, to any person having a claim against either the FDIC or the "insured depository institution for which such receiver is appointed," in this case, First American. First Richmond is neither the FDIC nor First American; consequently, this action is not directly controlled by the statute. First Richmond argues, however, that City & Suburban has no greater right against it than City & Suburban would have had if the servicing rights had not been sold by the FDIC. For that proposition, First Richmond cites two cases: *First Indiana Fed. Says. Bank v. F.D.I.C.*, 964 F.2d 503 (5th Cir.1992) and *Lawson v. Fleet Bank of Maine*, 807 F.Supp. 136 (D.Me.1992).

In *First Indiana*, 964 F.2d at 505, the FDIC acted as receiver for United Savings Association of Texas ("Old United") when it became insolvent. The district court had held that when New United obtained Old United's interest in a participation agreement through a transfer from the FSLIC, New United was not responsible for Old United's unsecured obligations that arose under the participation agreement. *Id.* The Court of Appeals affirmed, holding that under the terms of the acquisition agreement the FSLIC transferred to New United "only the secured, deposit and certain tax liabilities" not the unsecured liabilities of Old United that had accrued as of the date of the transfer. *Id.* at 506–07. The court explained that because New United did not obtain any unsecured liabilities under the acquisition agreement, First Indiana's only recourse was to proceed against the FDIC as receiver for Old United. *Id.* at 507. The Court of Appeals applied 12 U.S.C. § 1821(i)(2) only to the claims against the FDIC. *See id.* The

*First Indiana* case is, therefore, of no help to First Richmond.

Similarly, the district court in *Lawson*, 807 F.Supp. at 143, applied 12 U.S.C. § 1821(i)(2) only to the liability of the FDIC.[5] The relevant section of *Lawson* actually serves to defeat First Richmond's arguments. The plaintiffs were holders of certificates of deposit ("CD's") that had been earning interest at the rate of 7.95% from Maine Savings Bank. *Lawson*, 807 F.Supp. at 138. Subsequently, the FDIC was appointed as receiver for Maine Savings Bank. *Id.* The FDIC then signed a purchase and assumption agreement ("P & A") with Fleet Bank of Maine ("Fleet"). The P & A provided that after 14 days Fleet could reduce the interest rate on the CD's to a rate not less than the rate of interest Fleet paid with respect to passbook savings accounts. *Id.* at 139. In accordance with the P & A, Fleet reduced the interest rate to 6.125%.[6] *Id.* The plaintiffs sued both Fleet and the FDIC. The Court found that under the plain language of the P & A neither the FDIC nor Fleet intended that the interest obligations of the failed bank would pass to Fleet. *Id.* at 140. The district court ruled that it "should not and will not rewrite the contract to effect a transfer desired by Plaintiffs but quite explicitly not intended by the parties to the contract." *Id.* at 141. The Court found the P & A to be clear and unambiguous. *Id.* The Court of Appeals affirmed on that point, finding the contractual language at issue to be "a walk in the park." *Lawson v. Federal Deposit Ins. Corp.*, 3 F.3d 11, 16–17 (1st Cir.1993).

Both *First Indiana* and *Lawson* relied on basic principles of contract law to bind a party who had contracted with the FDIC to its contractual obligations. Neither case extended the protections of 12 U.S.C. § 1821(i)(2) to a party other than the FDIC. First Richmond has identified no other provi-

---

**5.** The Court of Appeals for the First Circuit found that the district court erroneously applied the statute, but affirmed the district court on different grounds. *See Lawson v. Federal Deposit Ins. Corp.*, 3 F.3d 11 (1st Cir.1993). First Richmond did not cite the appellate opinion in its Memorandum of Law.

**6.** First Richmond argues in its Memorandum of Law that Fleet "announced that it was reducing the interest rates payable to the depositors based on § 1821, and its right to do so was upheld." (D.I. 36 at 4). This Court can find absolutely no support in *Lawson* for such a contention. Fleet reduced the interest rates pursuant to its contract with the FDIC, not "based on § 1821."

sion of FIRREA that would indicate congressional intent to preempt lawsuits such as this one. Moreover, First Richmond does not contend that Congress intended for FIRREA to broadly preempt state law in the interpretation of all contracts involving the FDIC. Consequently, this Court finds that 12 U.S.C. § 1821 is inapplicable and that FIRREA does not preempt state law in this case. *Cf. Gaff v. Federal Deposit Ins. Corp.*, 919 F.2d 384, 391 (6th Cir.1990) ("Congress has clearly indicated that the liability of officers and directors of a bank are determined under federal law."), *modified on other grounds,* 933 F.2d 400 (6th Cir.1991).[7]

The only other case cited by First Richmond also provides support for City & Suburban's position. First Richmond cites *B.L. Nelson and Assocs., Inc. v. Sunbelt Savs., FSB*, 733 F.Supp. 1106 (N.D.Tex.1990), for the proposition that "a bank purchasing assets from the FDIC becomes a holder in due course entitled to the same rights as the FDIC with respect to such assets and may limit its obligation accordingly." (D.I. 36 at 4). Yet, First Richmond does not appear to argue that the holder in due course doctrine is somehow applicable to this case. Again, First Richmond has disregarded the relevant part of a judicial opinion. The section of *B.L. Nelson* that applies to this case was the straightforward contractual analysis performed by the Court, in which it found that the contract had transferred to Sunbelt Savings Bank certain deposit and secured asset liabilities of a failed savings association but that the FSLIC retained liability under the agreement for the unsecured claims being brought by two plaintiffs. *See B.L. Nelson,* 733 F.Supp. at 1109.

The FDIC had the power to transfer to First Richmond all of the rights and liabilities contained in the Participation Agreements. The FDIC also had the power to transfer only some of these rights and liabilities, and retain others. Alternatively, the FDIC could have disaffirmed or repudiated all or part of the Participation Agreements in accordance with 12 U.S.C. § 1821(e)(1). The

question posed by the pending motion, however, is not whether the FDIC properly exercised its power to dispose of the assets of an insolvent institution. Rather, the question is simply what rights and obligations of the Participation Agreements did the FDIC transfer to First Richmond under the Loan Sale Agreement.

The answer to that question can be found in the Loan Sale Agreement. As stated in the Loan Sale Agreement, First Richmond took its interest in the mortgage loans "together with and subject to all of Seller's rights and duties in respect of each of the Loans arising under or by reason of any or all of [the Participation Agreements], including without limitation, the rights and duties related to the servicing of the Loans (collectively, the 'Servicing Rights')." First Richmond agreed in the Loan Sale Agreement "to purchase, accept and assume the foregoing, and to be bound by and faithfully and timely to perform all of Seller's obligations related to the Participation Agreements." This language is unambiguous and is reasonably susceptible to only one interpretation. All of the servicing obligations of the Participation Agreements were transferred from the FDIC to First Richmond. First Richmond has admitted that it has failed to meet the servicing obligations asserted by City & Suburban. As a result, City & Suburban's motion for partial summary judgment will be granted.

## VI.

The only remaining question involves the issue of damages. It is clear from the record submitted that City & Suburban is entitled to some measure of damages for First Richmond's breach of the Participation Agreements. It is undisputed that such damages should include interest computed at the rate of 10% per annum. The precise calculation of damages, however, must wait for trial.

7. Even the preemption found in *Gaff* is far from uniformly followed. A number of courts have disagreed with *Gaff* and have denied preemption. *See, e.g., Resolution Trust Corp. v. Fiala,* 870 F.Supp. 962, 967 n. 3 (E.D.Mo.1994); *Federal Deposit Ins. Corp. v. Black,* 777 F.Supp. 919, 922 (W.D.Okla.1991); *Federal Deposit Ins. Corp. v. Isham,* 777 F.Supp. 828 (D.Colo.1991).