Filed 8/16/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CALIFORNIA BANK & TRUST, | |
| Plaintiff and Appellant, | G047122 |
| v. | (Super. Ct. No. 30-2010-00385744) |
| PIEDMONT OPERATING PARTNERSHIP et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Gregory Munoz, Judge. Reversed and remanded.

McKenna Long & Aldridge, Jeffrey L. Fillerup, John T. Brooks and Andrew S. Azarmi for Plaintiff and Appellant.

Hanson Bridgett, Nancy J. Newman, Joseph M. Quinn and Emily M. Charley for Defendants and Respondents.

\*         \*         \*

"In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, which is often referred to by the acronym FIRREA, and is codified at title 12 United States Code section 1821(d) . . . ." (*Neman v. Commercial Capital Bank* (2009) 173 Cal.App.4th 645, 648.) FIRREA "was designed to provide for takeovers of failed federally insured banking institutions" and "to provide a smooth mechanism for the rehabilitation" of such institutions and for the disposal of claims against them. (*Ibid*.) "FIRREA is a public program that adjusts the benefits and burdens of economic life to promote the common good. [Citations.]" (*Resolution Trust Corp. v. Ford Motor Credit Corp.* (11th Cir. 1994) 30 F.3d 1384, 1389.) It "alters contractual rights 'in order to stem the disruption of banking services within communities, lessen the costs of bank liquidation, and restore public confidence in the nation's banking system'[]." (*Ibid.*) So, on the one hand, a landlord who leases premises to a bank takes the risk that the bank may fail and FIRREA may limit his or her remedies with respect to any damages suffered due to the bank's failure, but on the other hand, the blow to the community is softened because the Federal Deposit Insurance Corporation (FDIC) as receiver of the failed bank has the tools to find a successor bank to take over the deposits of the failed bank and continue providing banking services to the depositors.

FIRREA gives the FDIC broad powers in resolving the affairs of a failed bank. This includes the express power to repudiate, or "disaffirm," contracts to which the failed bank is a party, including the lease pursuant to which the failed bank occupies its premises. FIRREA also expressly provides that, once the lease is disaffirmed, the landlord has no claim against the FDIC for future rent, even if the lease contains an acceleration clause. (12 U.S.C. § 1821(e)(4)(B); *Qi v. FDIC* (D.D.C. 2010) 755 F.Supp.2d 195, 200, 203-204; accord, *Resolution Trust Corp. v. Ford Motor Credit Corp.*, *supra*, 30 F.3d at p. 1387.) This means that the landlord cannot claim an asset of the failed bank, which has become an asset of the FDIC as receiver of the failed bank, to

2

satisfy a claim for future rent, even if the asset has been pledged as security for the performance of the lease. (*Resolution Trust Corp. v. Ford Motor Credit Corp.*, *supra*, 30 F.3d at p. 1387.)

Boiled to its essence, this case presents two questions: (1) If the FDIC has transferred assets and liabilities of the failed bank to another bank, can the landlord then seize the pledged asset because the FDIC no longer holds it? (2) Is the answer any different if the asset in question is a bank deposit serving as collateral for a letter of credit, which in turn secures the performance of the lease? Here, we answer each of these questions in the negative. To permit a landlord to effectively seize the collateral underlying a letter of credit after the FDIC has disaffirmed the lease and transferred the collateral to a successor bank would be to hamstring the FDIC in its efforts to wind up the affairs of a failed bank and promote stability in the banking system. (See *Resolution Trust Corp. v. Ford Motor Credit Corp.*, *supra*, 30 F.3d at p. 1389.)

In the matter before us, after the lease was disaffirmed, landlord Piedmont Operating Partnership, L.P. (Piedmont)[1] had no right to effectively seize a $500,000 deposit belonging to California Bank & Trust (California Bank), the transferee of the assets of the failed bank, by drawing down on the letter of credit which was secured by that deposit. Piedmont had no claim against California Bank, which had not assumed the lease, and it had no claim for future rent against the FDIC as receiver. We reverse the judgment in favor of Piedmont.

In addition, we hold that, based on the undisputed facts, California Bank was entitled to a judgment in its favor on its California Uniform Commercial Code section 5110, subdivision (a)(2) breach of warranty claim against Piedmont, as a matter of law. Therefore, pursuant to California Uniform Commercial Code section 5111,

---

[1] Piedmont Office Realty Trust, Inc., also a defendant and respondent herein, is the general partner of Piedmont Operating Partnership, L.P.

3

subdivision (e), California Bank is entitled to an award of reasonable attorney fees and other expenses of litigation. The trial court shall determine the amount of the award on remand.

I

FACTS

Piedmont leased certain office space to Alliance Bank. Alliance Bank provided Piedmont with a $500,000 standby letter of credit as security for the lease. Union Bank of California, N.A. (Union Bank) was the issuer of the letter of credit and Alliance Bank put $500,000 on deposit at Union Bank as collateral for the letter of credit.

In February 2009, the Commissioner of Financial Institutions of the State of California closed Alliance Bank and appointed the FDIC as receiver. Pursuant to a purchase and asset assumption agreement, the FDIC sold the assets of Alliance Bank, as is, to California Bank. Alliance Bank's $500,000 deposit at Union Bank was among the assets sold to California Bank.

By letter of May 12, 2009, the FDIC as receiver of Alliance Bank notified Union Bank that, pursuant to title 12 United States Code section 1821(e), it was disaffirming the agreement between Union Bank and Alliance bank concerning the letter of credit. The FDIC demanded that the collateral for the letter of credit be released to it immediately. However, Union Bank did not deliver the funds to the FDIC.

On May 29, 2009, the FDIC disaffirmed the lease. At the time the lease was disaffirmed, the monthly rent of $73,754.44 was current. Nonetheless, the FDIC informed Piedmont of its right to submit a proof of claim with respect to any damages suffered due to the disaffirmance. Piedmont thereafter filed a claim for $901,065 for future rent for the one-year period following the lease disaffirmance.

4

In addition to filing the claim, Piedmont presented a $500,000 sight draft to Union Bank, to draw down the letter of credit. Union Bank paid the proceeds of the letter of credit to Piedmont and debited California Bank's $500,000 account accordingly.

California Bank later commenced litigation against both Piedmont and Union Bank, alleging that Piedmont did not have the right to draw upon the letter of credit after the FDIC had disaffirmed the lease and that Union Bank did not have the right to honor presentation of the sight draft after it had received a disaffirmance notice from the FDIC. California Bank represents that it settled with Union Bank before trial. Union Bank was dismissed from the case.

The court entered judgment in favor of Piedmont and awarded Piedmont nearly $395,000 in attorney fees and costs. California Bank appeals.

## II

## DISCUSSION

*A. Trial and Judgment:*

In its first amended complaint, California Bank asserted four causes of action. It sought declaratory relief in the form of an order stating that, after the disaffirmance of the lease and the letter of credit, Piedmont did not have a right to draw down the letter of credit and Union Bank did not have a right to honor the presentation of the sight draft, and that California Bank was entitled to recover the $500,000. California Bank also asserted a cause of action for violation of Business & Professions Code section 17200, contending that the draw upon the letter of credit despite the disaffirmance of the lease was an unlawful, fraudulent and/or unfair business practice, and a cause of action for violation of Commercial Code sections 5108, subdivision (e) and 5110, subdivision (a). Finally California Bank asserted a cause of action for unjust enrichment.

The matter was tried without a jury. The court observed that each of California Bank's causes of action was predicated on the assertion that title 12 United

5

States Code section 1821(e)(4)(B) applied to the facts of the case so as to limit Piedmont's damages. It quoted from title 12 United States Code section 1821(e)(4), pertaining to leases under which the failed bank was the lessee.

Title 12 United States Code section 1821(e)(4)(A) provides in pertinent part: "If the . . . receiver disaffirms or repudiates a lease under which the insured depository institution was the lessee, the . . . receiver shall not be liable for any damages (other than damages determined pursuant to subparagraph (B)) for the disaffirmance or repudiation of such lease." Section 1821(e)(4)(B) provides in pertinent part: "Notwithstanding subparagraph (A), the lessor under a lease to which such subparagraph applies shall—[¶] (i) be entitled to the contractual rent accruing before the later of the date—[¶] (I) the notice of disaffirmance or repudiation is mailed; or [¶] (II) the disaffirmance or repudiation becomes effective . . . ; [¶] (ii) have no claim for damages under any acceleration clause or other penalty provision in the lease; and [¶] (iii) have a claim for any unpaid rent, subject to all appropriate offsets and defenses, due as of the date of the appointment . . . ."

The court held that title 12 United States Code section 1821(e)(4)(B) was not designed to protect third parties such as California Bank and that California Bank could not use the statute "to claim the proceeds of the [letter of credit] for itself." It further held that Piedmont had been within its rights in making a call on the letter of credit. Consequently, the court held, each of California Bank's causes of action failed.

B. *Preliminary matter:*

The trial court was correct that the cornerstone of California Bank's case, upon which all causes of action are built, is the assertion that Piedmont was precluded by title 12 United States Code section 1821(e)(4) from collecting the $500,000 after the FDIC disaffirmed the lease. As noted above, California Bank sought declaratory relief in

6

the form of a determination that after the FDIC sent out disaffirmance notices with respect to the lease and the letter of credit, Piedmont had no right to draw down the letter of credit and Union Bank had no right to honor the presentation of the sight draft, and that California Bank was entitled to recover the $500,000. In the parties' joint list of controverted issues, California Bank identified the effect of title 12 United States Code section 1821(e)(4) upon various rights of Piedmont as among the central issues at trial. In addition, California Bank addressed the effects of title 12 United States Code section 1821(e)(4) extensively in its trial brief. Piedmont did the same. And, as we have observed, the trial court ruled upon the effects of title 12 United States Code section 1821(e)(4).

On appeal, Piedmont says California Bank has failed to present argument about the declaratory relief cause of action in its opening brief and thus has waived the right to argue the court erred in its ruling on that cause of action. However, we observe that California Bank's first substantive argument, comprising 14 pages, falls under the topic heading "PIEDMONT HAS NO RIGHT TO THE PROCEEDS OF THE LETTER OF CREDIT BECAUSE IT WAS NOT ENTITLED TO ANY DAMAGES AFTER THE FDIC DISAFFIRMED THE LEASE." Its second substantive argument, comprising seven pages, is found under the topic heading "THE TRIAL COURT INCORRECTLY FOUND THAT [CALIFORNIA BANK] COULD NOT RECOVER THE $500,000 BECAUSE IT IS NOT THE FDIC." The arguments are based on title 12 United States Code section 1821(e)(4) and cases interpreting the statute. California Bank clearly attacked the court's interpretation of that statute and the related cases, even though it did not choose to utilize a topic heading stating "THE COURT ERRED IN DENYING CALIFORNIA BANK'S REQUEST FOR DECLARATORY RELIEF IN ITS FAVOR." California Bank has not failed to challenge to the court's ruling on the issues framed by declaratory relief cause of action.

7

Furthermore, Piedmont has had every opportunity to respond to California Bank's arguments about title 12 United States Code section 1821(e)(4) and related case law, and indeed has done so. There is no reason to conclude either that California Bank has waived a challenge to the ruling on the issues framed by the declaratory relief cause of action or that Piedmont has been prejudiced by the manner in which California Bank presented its argument in its opening brief. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.) In short, the court determined the issues of law framed by the declaratory relief cause of action adversely to California Bank and those determinations of law are properly challenged on appeal.

C. *Title 12 United States Code Section 1821(e)(4):*

  *(1) Introduction—*

FIRREA "grants the FDIC as receiver the discretion and power to dispose of assets and liabilities of failed financial institutions. [Citations.] Specifically, the FIRREA grants the FDIC-receiver the authority to 'disaffirm or repudiate any contract or lease' to which the failed institution on whose behalf it acts is a party if it determines, in its discretion, that performance of the lease would be burdensome and that such a disaffirmance or repudiation would 'promote the orderly administration of the institution's affairs.' [Citations.]" (*Qi v. FDIC*, *supra*, 755 F.Supp.2d at p. 200, fn. omitted; accord, *Resolution Trust Corp. v. Ford Motor Credit Corp.*, *supra*, 30 F.3d at pp. 1386-1387.) Title 12 United States Code section 1821 "[s]ubsection (e)(4)(B) governs the receiver's 'overall liability for damages when it repudiates a lease.' [Citation.]" (*Qi v. FDIC*, *supra*, 755 F.Supp.2d at p. 201.) "[I]t is quite clear that the FIRREA does not permit a lessor's recovery for future rents or penalties. [Citations.]" (*Ibid.*) Put another way, "the FIRREA clearly prohibits recovery based on penalties stemming from the repudiation of leases. 12 U.S.C. § 1821(e)(4)(B)(ii) (providing that

8

the lessor has 'no claim for damages under any acceleration clause or other penalty provision' for disaffirmance or repudiation of the lease)." (*Qi v. FDIC*, *supra*, 755 F.Supp.2d at pp. 203-204.)

Title 12 United States Code section 1821(e)(4) notwithstanding, Piedmont claims it is entitled to damages for future rent. Piedmont further contends it was entitled to draw down the letter of credit (and effectively seize California Bank's $500,000 deposit at Union Bank), because it had a right to the collateral securing the performance of the lease. In assessing these claims, we first look to cases addressing the effect of lease disaffirmance upon pledged assets.

*(2) Effect on Pledged Assets—*

*Resolution Trust Corp. v. Ford Motor Credit Corp.*, *supra*, 30 F.3d 1384, upon which California Bank relies, is instructive. There, the Resolution Trust Corporation (RTC) as receiver repudiated certain leases pursuant to which the failed savings and loan association had leased equipment from Ford Motor Credit Corporation (Ford). The savings and loan association's obligations under the leases were secured by certain pledged assets. Ford claimed that it had a right to utilize the pledged assets to satisfy its damages claim in an amount greater than the accrued rent. (*Id.* at p. 1386.) In the receiver's declaratory judgment action, the district court entered summary judgment in favor of the receiver. (*Ibid.*)

The Eleventh Circuit affirmed. (*Resolution Trust Corp. v. Ford Motor Credit Corp.*, *supra*, 30 F.3d at p. 1390.) It rejected the proposition that title 12 United States Code section 1821(e)(4)(B) only limited the liability of the receiver, but did "not block recovery against property in which the lessor has a perfected security interest." (*Resolution Trust Corp. v. Ford Motor Credit Corp.*, *supra*, 30 F.3d at p. 1387.) It stated that the proposition was "clearly contrary to the plain language of the statute." (*Ibid.*)

9

The court continued: "Section 1821(e)(4)(B) states that a lessor *shall have no claim* under any acceleration or penalty clause. It does not state . . . that a lessor has no claim *against the [receiver]* under an acceleration clause, but may have such a claim against any pledged collateral. Ford simply cannot recover future rents from any party or against any property." (*Ibid*, original italics.)

The court acknowledged that the lease disaffirmance had caused an economic impact on Ford. (*Resolution Trust Corp. v. Ford Motor Credit Corp.*, *supra*, 30 F.3d at p. 1388.) However, it stated that the impact was not one of constitutional dimension and that the receiver's lease disaffirmance had simply deprived Ford of future rent. (*Ibid.*) The court observed that "FIRREA is a public program that adjusts the benefits and burdens of economic life to promote the common good. [Citations.]" (*Id.* at p. 1389.) It noted "that FIRREA alters contractual rights 'in order to stem the disruption of banking services within communities, lessen the costs of bank liquidation, and restore public confidence in the nation's banking system'[]." (*Ibid.*)

According to California Bank, *Resolution Trust Corp. v. Ford Motor Credit Corp.*, *supra*, 30 F.3d 1384 shows that once the FDIC disaffirmed the Alliance Bank lease, Piedmont had no claim for future rent or for any damages arising out of an acceleration clause in the lease, and lost any claim to the proceeds of the letter of credit. Piedmont, on the other hand, states that California Bank's reliance on *Resolution Trust Corp. v. Ford Motor Credit Corp.*, *supra*, 30 F.3d 1384 is misplaced. It contends that the case is wholly inapposite because it involved pledged assets, rather than a letter of credit. It ignores the language of the case stating that, after lease disaffirmance, a landlord has no claim for future rents, or sums owing based on an acceleration clause, and "simply cannot recover future rents from any party or against any property." (*Id.* at p. 1387.)

California Bank also cites *Unisys Finance Corp. v. Resolution Trust Corp.* (7th Cir. 1992) 979 F.2d 609. In *Unisys*, the RTC as receiver disaffirmed an equipment

10

lease under which the failed financial institution was the lessee. The lessor of the equipment conceded that it could not sue the receiver for the loss of future rents. However, it claimed that it could nonetheless satisfy its claim for future rents out of the securities that had been pledged as collateral for the lease. (*Id.* at p. 610.) The court rejected the argument. It stated that under "12 U.S.C. § 1821(e)(4), the lessor's damages claim [was] completely extinguished except for back rent" and that "[w]ith the claim gone, any basis for enforcing a security interest [was] gone with it." (*Unisys Finance Corp. v. Resolution Trust Corp.*, *supra*, 979 F.2d at p. 611.) It further stated: "You must have a claim before you can look to the collateral for its repayment." (*Ibid.*) In other words, "[a] lien is a parasitic on a claim. If the claim disappears—poof! the lien is gone." (*Ibid.*) As the court aptly pointed out, the lessor's "real gripe . . . [was] not the loss of its security interest; it [was] the loss of the claim that the security interest secured." (*Id.* at p. 612.)

Well put. Here, Piedmont's real gripe isn't the fuss over whether it was proper to proceed against the letter of credit, but the fact that the FDIC disaffirmed the lease and Piedmont thereupon lost its right either to collect future rents or to make a claim for the same. But this is a point of law set forth in a federal statutory scheme that "adjusts the benefits and burdens of economic life to promote the common good. [Citations.]" (*Resolution Trust Corp. v. Ford Motor Credit Corp.*, *supra*, 30 F.3d at p. 1389.) It is not a matter we could control even if our view of the equities were different from that of Congress.

As we see it, *Unisys Finance Corp. v. Resolution Trust Corp.*, *supra*, 979 F.2d 609, just as *Resolution Trust Corp. v. Ford Motor Credit Corp.*, *supra*, 30 F.3d 1384, makes clear that a lessor whose lease is disaffirmed does not have the right to proceed against the collateral securing the performance of the lease, in order to satisfy a claim for future rents. But Piedmont insists that *Unisys* is distinguishable.

11

Piedmont emphasizes that in *Unisys Finance Corp. v. Resolution Trust Corp.*, *supra*, 979 F.2d 609, the pledged collateral belonged to the receivership estate, not a successor bank. Piedmont argues the holding in *Unisys* protected the interests of the taxpayers, but there is "no taxpayer asset" at stake in the matter before us. This argument is unconvincing.

Piedmont cites no authority supporting either the proposition that the taxpayers are the owners of failed bank assets or the proposition that they are responsible for paying off creditor's claims if the assets of the failed bank are insufficient to cover them. Rather, a failed bank receivership is akin to a bankruptcy proceeding and the receiver functions much like a trustee in bankruptcy. (*Unisys Finance Corp. v. Resolution Trust Corp.*, *supra*, 979 F.2d at p. 611.) The receiver has an obligation to conduct the operations of the receivership "in a manner '"which [] maximizes the net present value return from the sale or disposition of" [failed bank] assets that come into its hands.' [Citation.]" (*Tsemetzin v. Coast Federal Savings & Loan Assn.* (1997) 57 Cal.App.4th 1334, 1345.) Piedmont has not shown that the taxpayers are disadvantaged if the FDIC determines that the best way to maximize the return is to sell certain assets and liabilities to another bank. However, it is apparent that if a landlord who was not permitted to seize a pledged asset in the hands of the FDIC as receiver were permitted to seize that asset as soon as the FDIC transferred it to a healthy bank, the FDIC's options would be limited and it would be hamstrung in its efforts to maximize the return on the failed bank assets. This would not be consistent with the goals of FIRREA.

### (3) Effect on Letters of Credit—

Piedmont also says there is a fundamental difference between what it calls "ordinary security" and letters of credit. It contends that the "independence principle" applicable to letters of credit compels a different outcome in this case than in *Unisys*

12

*Finance Corp. v. Resolution Trust Corp.*, *supra*, 979 F.2d 609.  Piedmont cites *San Diego Gas & Electric Co. v. Bank Leumi* (1996) 42 Cal.App.4th 928 and *Federal Deposit Ins. Corp. v. United States Trust Co.* (D.C. Mass. 1992) 793 F.Supp. 368 in support of its position.

As explained in *San Diego Gas & Electric Co. v. Bank Leumi*, *supra*, 42 Cal.App.4th 928, "'Three contractual relationships exist in a letter of credit transaction. [Citations.]  Underlying the letter of credit transaction is the contract between the bank's customer and the beneficiary of the letter of credit, which consists of the business agreement between these parties.  Then there is the contractual arrangement between the bank and its customer whereby the bank agrees to issue the letter of credit, and the customer agrees to repay the bank for the amounts paid under the letter of credit. . . . Finally, there is the contractual relationship between the bank and the beneficiary of the letter of credit created by the letter of credit itself.  The bank agrees to honor the beneficiary's drafts or demands for payment which conform to the terms of the letter of credit. [Citations.]' [Citation.] [¶] Although the relationship between the issuer and beneficiary of a letter of credit is often loosely described as 'contractual,' . . . this is an inaccurate characterization." (*Id.* at p. 933.)  It is better to characterize the letter of credit as "'an "undertaking" and so avoid the implication that contract principles might apply to it.' [Citations.]" (*Ibid.*)

Under the "independence principle," the letter of credit is independent from the underlying contract between the issuing bank's customer (here Alliance Bank) and the beneficiary of the letter of credit (here Piedmont).  (*San Diego Gas & Electric Co. v. Bank Leumi*, *supra*, 42 Cal.App.4th at pp. 933-934.)  "Absent fraud, the issuer must pay upon proper presentment regardless of any defenses the applicant for the letter of credit may have against the beneficiary arising from the underlying transaction.  [Citation.] Thus, the issuer of a letter of credit is never entitled to defend against payment based on

13

extraneous defenses which might have been available to the primary obligor." (*Id.* at p. 934.) "'The rule of independence . . . is based on two policy considerations. First, the issuing bank can assume no liability for the performance of the underlying contract because it has no control over making the underlying contract or over selection of the beneficiary [citation]. Second, the letter of credit would lose its commercial vitality if, before honoring drafts, the issuing bank were obliged to look beyond the terms of the letter of credit to the underlying contractual controversy between its customer and the beneficiary [citation].' [Citation.]" (*Ibid.*)

Piedmont says the principles enunciated in *Unisys Finance Corp. v. Resolution Trust Corp.*, *supra*, 979 F.2d 609, which did not involve a letter of credit, have no application here because, in a letter of credit context such as the one before us, the liability of the issuer is independent of the obligations between the issuer's customer, on the one hand, and the beneficiary of the letter of credit, on the other. However, the question of Union Bank's liability under the letter of credit based on the independence principle is not before us. Rather, our inquiry pertains to the rights of Piedmont, not the obligations of Union Bank. Simply put, whether an issuer is bound to honor a draw upon a letter of credit is a different issue from whether the beneficiary of the letter of credit is legally entitled to retain the proceeds of the draw. Furthermore, *San Diego Gas & Electric Co. v. Bank Leumi*, *supra*, 42 Cal.App.4th at p. 928 was not a bank receivership case and did not address the effect of the FDIC's disaffirmance of either a lease or an agreement between a failed bank and an issuer of a letter of credit. Here, as we recall, the FDIC disaffirmed both.

So, we turn to Piedmont's next authority, *Federal Deposit Ins. Corp. v. United States Trust Co.*, *supra*, 793 F.Supp. 368. In that case, the FDIC became the receiver of a failed bank that had leased certain equipment. A letter of credit secured the performance of the lease and the failed bank's $200,000 deposit at the issuing bank

14

served as collateral for the letter of credit. After the failed bank was placed in receivership, the equipment lessor presented a sight draft to the issuing bank, seeking to draw upon the letter of credit. Nine days *later*, the FDIC disaffirmed the equipment lease, the letter of credit, and the pledge agreement between the failed bank and the issuing bank. It also filed an action seeking to enjoin the lessor from receiving payment under the letter of credit. (*Id.* at pp. 369-370.)

The court addressed the "independence principle" in the receivership context by analogy to bankruptcy proceedings. It stated: "'If . . . the customer goes into bankruptcy after the letter has been issued, but before it has been drawn upon, the issuer must pay despite the fact that the customer will not be able to pay the issuer. The same would be true if the customer had repudiated the contract of reimbursement. Since these are the very risks (customer's insolvency or unwillingness to pay) which the beneficiary sought to avoid by demanding the issuance of the letter of credit, it should not be surprising that the issuer cannot assert them as defenses against the beneficiary.' [Citations.]" (*Federal Deposit Ins. Corp. v. United States Trust Co.*, *supra*, 793 F.Supp. at p. 371.) The court continued: "Given these considerations, courts have consistently recognized that, in the absence of fraud, a court should not enjoin payment of a letter of credit. [Citations.]" (*Id.* at pp. 371-372, fn. omitted.)

Consistent with this general rule, the court declined to enjoin payment under the letter of credit. (*Federal Deposit Ins. Corp. v. United States Trust Co.*, *supra*, 793 F.Supp. at p. 373.) In so doing, it rejected the FDIC's argument that the issuing bank should be enjoined from making payment because title 12 United States Code section 1821(e)(4)(B) precluded the lessor's claim for future rents. The court stated that the lessor was not seeking to enforce its rights under the lease, but was seeking to enforce its rights against the issuing bank under the letter of credit. (*Federal Deposit Ins. Corp. v. United States Trust Co.*, *supra*, 793 F.Supp. at p. 373.)

15

However, in the matter before us, neither the obligations of Union Bank as the issuer of the letter of credit nor the rights of Piedmont against Union Bank are at issue. The question is not whether the "independence principle" would preclude the issuance of an injunction to stop Union Bank from making payment under the letter of credit. The only question before us is whether Piedmont is entitled to keep the $500,000 it effectively seized already. *Federal Deposit Ins. Corp. v. United States Trust Co.*, *supra*, 793 F.Supp. 368 is inapposite.

We look instead at *Resolution Trust Corp. v. United Trust Fund, Inc.* (11th Cir. 1995) 57 F.3d 1025, which is more nearly on point. In that case, Pioneer Federal Savings Bank (Old Pioneer) provided a $4.5 million letter of credit to secure its obligations under its lease, and pledged $9 million in performing mortgages as collateral in support of the letter of credit. The landlord, in turn, applied for a loan from Financial Federal Savings and Loan Association of Dade County (Financial Federal) and assigned the letter of credit to Financial Federal as collateral for the loan. (*Id.* at p. 1030.) A few months later, the landlord assigned its rights to both the lease and the letter of credit to Liberty Bell Realty Associates (Liberty Bell). (*Id.* at p. 1031.)

The RTC was appointed receiver of Old Pioneer and substantially all of the assets and liabilities of Old Pioneer were transferred to a newly created financial institution also called Pioneer Federal Savings Bank (New Pioneer). The RTC, as conservator of New Pioneer, did not disaffirm the lease. About a year after Old Pioneer was placed into receivership, New Pioneer also was placed into receivership. The RTC then entered into a purchase and assumption agreement whereby Great Western Bank purchased some of the assets and assumed some of the liabilities of New Pioneer. However, Great Western Bank did not assume the lease. The RTC, as receiver of New Pioneer, ultimately disaffirmed the lease. (*Resolution Trust Corp. v. United Trust Fund, Inc.*, *supra*, 57 F.3d at p. 1031.)

16

The district court denied the RTC's request to enjoin a draw upon the letter of credit.  However, the proceeds of the letter of credit were deposited into an escrow account pending court proceedings.  (*Resolution Trust Corp. v. United Trust Fund, Inc.*, *supra*, 57 F.3d at p. 1031.)  That being the case, the Eleventh Circuit observed:  "Whether the draw was proper or not is moot at this point.  Rather, the right to the proceeds of that letter, not the right to draw on the letter, is the issue now before the court."  (*Id.* at p. 1034, fn. omitted.)  The court continued:  "Once the proceeds of a letter of credit have been drawn down, the underlying contracts become pertinent in determining which parties have a right to those proceeds."  (*Id.* at p. 1034.)

The Eleventh Circuit did not resolve which party was entitled to the proceeds of the letter of credit, inasmuch as the proper interpretation of the contractual obligations underlying the letter of credit had to be determined by the district court in the first instance.  (*Resolution Trust Corp. v. United Trust Fund, Inc.*, *supra*, 57 F.3d at p. 1035.)  It stated that one significant issue for determination on remand was whether the letter of credit only served as security for the performance of the lease obligations or whether it also served as security for repayment of the Financial Federal loan, "*independent of any default in the lease*?"[2]  (*Ibid.* at fn. 15.)

However, the Eleventh Circuit was specific as to one thing.  There was no claim to the proceeds of the letter of credit to the extent that the letter of credit served as security for the performance of lease obligations.  The court concluded that because the RTC had the statutory right to disaffirm the lease, the disaffirmance did not constitute a breach of the lease.  It also observed that the RTC had paid all rent through the date of

---

[2]    One wonders whether concern for this issue explains why the RTC apparently did not disaffirm the agreement(s) between Old Pioneer and the issuer with respect to the letter of credit.  (*Resolution Trust Corp. v. United Trust Fund*, *Inc.*, *supra*, 57 F.3d at p. 1036.)

17

disaffirmance. (*Resolution Trust Corp. v. United Trust Fund, Inc.*, *supra*, 57 F.3d at p. 1034.) It further stated: "'[A] secured creditor only has rights in the collateral equal to the amount of the creditor's claim. Once that claim is satisfied, the lien is of no further consequence.' [Citation.] Section 1821(e)(4) limits damages under the lease to rents accrued before a valid repudiation. [Citation.] Thus, [Liberty Bell and Financial Federal] have no remaining claim pursuant to the lease. [Citation.] The district court on remand will have to construe the underlying contractual obligations to determine whether either [Liberty Bell or Financial Federal] has a claim to the proceeds of the letter of credit independent of and absent a default under the lease." (*Resolution Trust Corp. v. United Trust Fund, Inc.*, *supra*, 57 F.3d at p. 1036, fn. omitted.)

Important to the resolution of the matters before us, the court in *Resolution Trust Corp. v. United Trust Fund, Inc.*, *supra*, 57 F.3d 1025, stated: "To the extent that the proceeds of the letter of credit were to serve as damages under the lease, i.e., future rents, [Financial Federal is] not entitled to any of the proceeds of the letter of credit because the lease was properly repudiated and there are no remaining damages under the lease." (*Id.* at p. 1036.) It stated that the district court on remand would have to construe the underlying contracts to determine whether Financial Federal had any claim "to the letter of credit proceeds independent of and absent a default under the lease." (*Ibid.*)

Applying *Resolution Trust Corp. v. United Trust Fund, Inc.*, *supra*, 57 F.3d 1025 to the facts before us, we see that the disaffirmance of the Alliance Bank lease did not constitute a breach of the lease and did not give rise to a claim of damages for future rent, and that Piedmont did not have a claim to the proceeds of the letter of credit. That being the case, Piedmont is wrongfully in possession of the $500,000 that lawfully belongs to California Bank, which acquired the deposit from the FDIC.

Piedmont heartily disagrees with this analysis. It focuses on the portion of *Resolution Trust Corp. v. United Trust Fund, Inc.*, *supra*, 57 F.3d 1025 stating that the

18

district court would have to interpret the underlying contracts to determine who should keep the proceeds of the letter of credit. Piedmont contends that California Bank cannot be entitled to the proceeds of the letter of credit because it is not a party to any of the underlying contracts and thus has no claim under any of those contracts. However, Piedmont overlooks the fact that Alliance Bank was a party to the underlying contracts, the FDIC as receiver stepped into the shoes of Alliance Bank (12 U.S.C. § 1821(d)(2)(A)), and the FDIC transferred its rights in the $500,000 deposit to California Bank, which thereupon acquired a claim of rights to the funds. Piedmont also ignores the fact that the court in *Resolution Trust Corp. v. United Trust Fund, Inc.*, *supra*, 57 F.3d 1025 made perfectly clear there was no entitlement to the letter of credit proceeds based upon the lease disaffirmance. (*Id*. at p. 1036.) Consequently, Piedmont has no claim to the letter of credit proceeds based on the disaffirmance of the Alliance Bank lease.

### *(4) Effect of Transfer of Assets—*

Piedmont also emphasizes that in the matter before us it is California Bank, not the FDIC, that is challenging Piedmont's rights under the letter of credit. It notes that neither *Resolution Trust Corp. v. United Trust Fund, Inc.*, *supra*, 57 F.3d 1025 nor any of the other cases California Bank cites holds that title 12 United States Code section 1821(e)(4) limits the rights of a landlord vis-à-vis a bank that acquires assets from the FDIC. It is equally true, however, that none of the cases Piedmont cites holds that a landlord, who would have no right to the proceeds of a letter of credit if the FDIC remained in possession of the security therefor, nonetheless could claim the security once the FDIC transferred it to another financial institution. As we have already stated, that would be contrary to all the aforementioned principles flowing from the application of title 12 United States Code section 1821(e)(4) and the goals of FIRREA.

19

Piedmont, however, maintains that those principles and goals do not apply where the security in question has been transferred to a bank other than the lessee. It relies on *City & Suburban Mgmt. Corp. v. First Bank* (1997) 959 F.Supp. 660 and *Tsemetzin v. Coast Federal Savings & Loan Assn.*, *supra*, 57 Cal.App.4th 1334 in support of its position. However, those cases are inapposite, as we shall show.

In *City & Suburban Mgmt. Corp. v. First Bank*, *supra*, 959 F.Supp. 660, First American Capital Bank, N.A. (First American) had certain servicing obligations under various loan participation and servicing agreements. The FDIC was appointed receiver of First American and transferred to First Bank of Richmond (First Richmond) all of First American's right, title and interest in and to the mortgage loans subject to the participation agreements. (*Id.* at pp. 662-663.) Under the loan sale agreement with the FDIC, First Richmond assumed the obligations of First American under the loan participation and servicing agreements. (*Id.* at p. 663.) City and Suburban Management Corporation (City and Suburban) filed a lawsuit against First Richmond arising out of the purported failure to properly perform the loan servicing obligations. (*Id.* at p. 662.) In its defense, First Richmond asserted that under the loan sale agreement, there was never any intention for First Richmond to assume the particular servicing obligations giving rise to the lawsuit. (*Id.* at p. 663.)

The parties stipulated that California law governed the contract claims and the court determined that the loan sale agreement unambiguously required First Richmond to perform the loan servicing obligations in question. It further held that City and Suburban, as a third party beneficiary of the loan sale agreement, had the right to enforce the agreement against First Richmond. (*City & Suburban Mgmt. Corp. v. First Bank*, *supra*, 959 F.Supp. at pp. 664-666.)

First Richmond argued that its contractual obligation was preempted by title 12 United States Code section 1821(i)(2), which provides in pertinent part: "The

20

maximum liability of the [FDIC], acting as a receiver . . . , to any person having a claim against the receiver or the insured depository institution for which such receiver is appointed shall equal the amount such claimant would have received if the [FDIC] had liquidated the assets and liabilities of such institution . . . ." (*City & Suburban Mgmt. Corp. v. First Bank*, *supra*, 959 F.Supp. at p. 666.) The court rejected the argument that this statute relieved First Richmond of performing its servicing obligations. (*Id.* at p. 667.) It stated that the statute was inapplicable and that FIRREA did not preempt state law in the matter. (*Id.* at p. 668.)

The court observed that the FDIC could have disaffirmed the participation agreements, but chose not to do so. Having chosen to transfer rights and obligations to First Richmond under the loan sale agreement, the only question was the scope of the rights and obligations transferred. The court reiterated that the language of the loan sale agreement was unambiguous and that all servicing obligations were transferred to First Richmond. Consequently, partial summary judgment in favor of City and Suburban was appropriate and only the question of damages remained for trial. (*City & Suburban Mgmt. Corp. v. First Bank*, *supra*, 959 F.Supp. at p. 668.)

*City & Suburban Mgmt. Corp. v. First Bank*, *supra*, 959 F.Supp. 660 is distinguishable from the matter before us. In *City & Suburban*, the FDIC did not disaffirm the participation agreements, but rather transferred them to First Richmond, which bound itself to undertake the servicing obligations. The court held that title 12 United States Code section 1821(i)(2) did not absolve First Richmond from the performance of those obligations and that a third party beneficiary was entitled to enforce them. In the matter before us, in contrast, the FDIC disaffirmed the lease, bringing title 12 United States Code section 1821(e)(4) into play, and California Bank did not obligate itself to undertake any lease obligations. *City & Suburban* simply does not dictate the result in this case.

21

We turn now to *Tsemetzin v. Coast Federal Savings & Loan Assn.*, *supra*, 57 Cal.App.4th 1334. In that case, Coast Federal Savings and Loan Association (Coast Federal) leased certain premises beginning in 1980. (*Id.* at p. 1338.) The lease provided that if Coast Federal ever assigned its interest in the lease to another financial institution, Coast Federal would "'*remain primarily liable*'" for all obligations under the lease. (*Id.* at p. 1339.) Coast Federal assigned its interest in the lease to Home Federal Savings and Loan Association (Home Federal) in 1989. (*Ibid.*) In 1992, the RTC as receiver of Home Federal disaffirmed the lease. (*Id.* at pp. 1339-1340.)

The landlord commenced an action against Coast Federal, seeking unpaid rent as far back as 1982. (*Tsemetzin v. Coast Federal Savings & Loan Assn.*, *supra*, 57 Cal.App.4th at p. 1338.) Coast Federal argued, inter alia, that the landlord's claim was barred by the lease disaffirmance. (*Id.* at p. 1340.) The court rejected this argument. (*Id.* at p. 1345.)

It stated: "First, it is clear that under the provisions of FIRREA . . . , which authorize the RTC to terminate the obligation of a failed institution, the only governmental interest is in concluding the obligation of *that* institution. The goal of FIRREA was to stem the 'financial hemorrhaging' from the large number of failures in the savings and loan or thrift industry. [Citation.] To reach that goal, Congress required that RTC conduct its operations in a manner '"which [] maximizes the net present value return from the sale or disposition of" thrift assets that come into its hands.' [Citation.] In order to discharge this critical function, 'Congress armed [RTC] with the power to disaffirm or repudiate contracts or leases that RTC in its discretion determines to be burdensome.' [Citations.] As another court emphasized, FIRREA grants authority to alter contracts in order to serve three critical public policy goals: (1) 'to stem the disruption of banking services within communities, [(2)] lessen the costs of bank liquidation, and [(3)] restore public confidence in the nation's banking system.'

22

[Citation.] In addition to such public policy considerations, the statutory rationale under FIRREA for permitting the termination of a contractual obligation is that (1) performance under the lease, has become *burdensome to the failed institution* and (2) termination of the lease will promote the orderly administration of *the failed institution's* affairs. Neither the public policy concerns underlying FIRREA nor either of these goals is advanced by extending the effect of the Home Federal lease termination to Coast Federal's obligation under that lease." (*Tsemetzin v. Coast Federal Savings & Loan Assn.*, *supra*, 57 Cal.App.4th at p. 1345.)

The court also stated that under the lease Coast Federal expressly promised that it would remain *primarily liable* under the lease even if it assigned its interests therein to another financial institution. (*Tsemetzin v. Coast Federal Savings & Loan Assn.*, *supra*, 57 Cal.App.4th at p. 1345.) Coast Federal could not avoid its continuing obligations under the lease just because its assignee went into receivership. (*Id.* at p. 1346.) The court stated: "[The] RTC's repudiation of the Home Federal lease, affected *only* obligations which could be asserted against *that* institution. It did not impact [the landlord's] right to pursue Coast Federal for any and all unpaid rentals coming due after [the date of lease disaffirmance]. Coast Federal remains liable on its express contractual commitments." (*Id.* at p. 1347.)

Piedmont says *Tsemetzin v. Coast Federal Savings & Loan Assn.*, *supra*, 57 Cal.App.4th 1334 shows that FIRREA only protects the failed bank that was placed in receivership, not any other financial institution. It says that just as the lease disaffirmance in *Tsemetzin* did not cut off claims against Coast Federal, the lease disaffirmance in the matter before us does not cut off the claims against California Bank. We disagree. In *Tsemetzin*, Coast Federal was not the transferee of the receiver. Rather, it was the assignor of a lease and specifically agreed to remain primarily liable under the lease even after the assignment took place. In the matter before us, however, California

23

Bank was the FDIC's transferee and did not assume the lease. *Tsemetzin* is plainly inapplicable.

Piedmont contends the broad policy considerations expressed in *Tsemetzin v. Coast Federal Savings & Loan Assn.*, *supra*, 57 Cal.App.4th 1334 show that it should not be precluded from retaining the $500,000 proceeds of the letter of credit. It says that FIRREA's goal of stemming "the 'financial hemorrhaging' from the large number of [financial institution] failures" by maximizing "'"the net present value return from the sale or disposition of"' . . . assets'" (*Tsemetzin v. Coast Federal Savings & Loan Assn.*, *supra*, 57 Cal.App.4th at p. 1345) has no application where the assets of the failed bank are transferred to another bank. Again, we do not agree. One way to curtail the damage from bank failures and to maximize the return from the disposition of failed bank assets, is to find a healthy bank willing to acquire some or all of the assets and liabilities of a failed bank, rather than to simply shut the doors of every failed bank and perform a straight liquidation of assets on hand. Finding a healthy bank to acquire assets and absorb liabilities also promotes the goals of reducing the disruption of banking services within the community and restoring public confidence in the banking system. Those goals would be contravened if the FDIC's ability to locate a transferee bank were hampered either because limited assets could be transferred or because those assets were of dubious value, being subject to claims that would be cut off if the FDIC made no transfer. Rather than supporting Piedmont's position, *Tsemetzin v. Coast Federal Savings & Loan Assn.*, *supra*, 57 Cal.App.4th 1334 undermines it.

Simply put, once the Alliance Bank lease was disaffirmed, leaving no unpaid rent, Piedmont had no claim for breach of lease and no claim for damages. It therefore was not entitled to claim the proceeds of the letter of credit, which served as

24

security in case of breach of the lease. The $500,000 securing the letter of credit belonged to California Bank and Piedmont, in essence, wrongfully acquired it.[3]

### (5) Effect of Financial Code Former Section 3111—

There is one final point for consideration, a point Piedmont argued in the trial court but has omitted to address on appeal. It has to do with the effect on this matter of Financial Code former section 3111. (Repealed by Stats. 2010, ch. 532, § 44.)

The FDIC, as we recall, was appointed receiver by the Commissioner of Financial Institutions of the State of California. Financial Code former section 3221 (repealed by Stats. 2010, ch. 532, § 44) empowered the Commissioner to tender the appointment to the FDIC. Financial Code former section 3222 (repealed by Stats. 2010, ch. 532, § 44) provided: "If the [FDIC] accepts the appointment as such receiver, the rights of depositors and other creditors of the insured bank shall be determined in accordance with the applicable provisions of the laws of this State."

In the trial court, Piedmont argued that Financial Code former section 3111 permitted it to claim one year's future rent as damages and that, inasmuch as the $500,000 at issue was far less than the amount of one year's future rent, it was entitled to keep the $500,000. Financial Code former section 3111 provided in pertinent part: "Within six months after taking possession of the property and business of any bank the commissioner may terminate or adopt any executory contract to which the bank may be a party including leases of real or personal property. Claims for damages resulting from

---

[3]    To be precise, Piedmont represents that when it drew upon the letter of credit, Union Bank first paid Piedmont $500,000 out of its own funds and then reimbursed itself out of the $500,000 deposit. Although that is not clear from the parties' joint stipulated facts, it matters not. The net result is the same: Piedmont drew upon the letter of credit that was secured by California Bank's deposit, such that Piedmont acquired $500,000 and California Bank lost the same.

25

the termination of any such contract or lease may be filed and allowed, but *no claim of a landlord for damages resulting from the rejection of an unexpired lease of real property . . . shall be allowed in an amount exceeding the rent reserved by the lease, without acceleration, for the year succeeding the date of the surrender of the premises* plus the amount of any unpaid accrued rent without acceleration. . . ."  (Fin. Code, former § 3111, italics added.)

According to California Bank, case law makes clear that federal law, not state statute, governs the issue of whether a landlord can claim any future rent after lease disaffirmance.  It says *Bayshore Executive Plaza Partnership v. FDIC* (11th Cir. 1991) 943 F.2d 1290 is on point.  In that case, a landlord sued the FDIC, as receiver of a state-chartered bank in Florida, for one year's rent following disaffirmance of the failed bank's lease.  (*Id.* at p. 1291.)  It argued that the FDIC was acting as an agent of the state and that its application of title 12 United States Code section 1821(e) in lease disaffirmance violated the contracts clause of the United States Constitution.  (*Bayshore Executive Plaza Partnership v. FDIC, supra,* 943 F.2d at p. 1291.)  Summary judgment in favor of the FDIC was affirmed.  (*Id.* at p. 1292.)

The Eleventh Circuit observed:  "[The landlord] misconstrues the role of the FDIC as liquidator of a state-chartered bank.  As we have stated before, when the FDIC is appointed receiver by a state banking authority, that agency acts in two separate capacities:  as receiver and as corporate insurer of deposits in the failed bank.  [Citation.] In neither role does the FDIC act as an agent of the state comptroller responsible for its appointment as liquidator.  [¶] Most importantly, 'it is settled beyond question that Federal law governs cases involving the rights of the FDIC' when that agency acts as liquidator for a failed bank.  [Citations.]  In addition, when a federal statute addresses the issue of law in contention, the federal statute governs the dispute, despite any federal or

26

state common law that might suggest another result.  [Citation.]" (*Bayshore Executive Plaza Partnership v. FDIC, supra,* 943 F.2d at pp. 1291-1292.)

As California Bank points out, *Bayshore Executive Plaza Partnership v. FDIC*, *supra*, 943 F.2d 1290 was cited with approval in *Monrad v. F.D.I.C.* (9th Cir. 1995) 62 F.3d 1169.)  *Monrad* had to do with employee severance payment rights, not landlord claims.  (*Id.* at pp. 1170-1171.)  There, the Ninth Circuit observed that the "assertion that [the] recoverable damages are to be determined under California law is misplaced.  '[W]hen a federal statute addresses the issue of law in contention, the federal statute governs the dispute, despite any federal or state common law that might suggest another result.'  (*Bayshore,* 943 F.2d at 1292.)" (*Monrad v. F.D.I.C.*, *supra*, 62 F.3d at p. 1173.)

Although this language is nearly dispositive, we observe that the court in *Bayshore Executive Plaza Partnership v. FDIC*, *supra*, 943 F.2d 1290 did not state that the federal statute governs even when the *state statutes* (as opposed to state common law) pursuant to which the FDIC was appointed receiver may provide a different result.  We also note that the case was based on an argument over the contracts clause and there is no indication whether the claim for one year's future rent was based on a Florida statute. (*Id.* at pp. 1291-1292.)

Although neither California Bank nor Piedmont makes the observation, it appears that the question whether federal statute governs, even when the state statutory body of law pursuant to which the FDIC accepted the appointment as receiver provides a contrary result, is a matter resolved by the state statutes themselves.  Financial Code former section 3223 provided:  "The [FDIC] as such receiver shall possess with respect to such closed insured bank all the powers, rights, and privileges given the commissioner under Article 1 of this chapter with respect to the liquidation of a bank the property and assets of which he or she has taken possession, *except insofar as the same may be in*

27

*conflict with the provisions of the Federal Deposit Insurance Act, as amended.*"  (Fin. Code, former § 3223, italics added.)  The Federal Deposit Insurance Act is found in title 12 United States Code section 1811 et seq.

Here, we have title 12 United States Code section 1281(e)(4), which provides that the landlord under a disaffirmed lease has no claim for future rent, versus Financial Code former section 3111, permitting a landlord to make a claim for one year's future rent.  Given the statutory conflict, section 3111 must yield.  This result is dictated by both Financial Code former section 3223 and federal preemption.  (See *Parks v. MBNA America Bank, N.A.* (2012) 54 Cal.4th 376, 382-383.)

California Bank says that Financial Code former section 3111 is inapplicable to banks that have federal deposit insurance.  In support of this assertion, it cites current Financial Code section 673, which is substantially similar to Financial Code former section 3111, but applies only when the commissioner takes over an uninsured financial institution.  California Bank cites no legislative history or other authority to show that Financial Code section 673 is intended to be a continuation of Financial Code former section 3111, without change.  Moreover, we note that at least one case has applied Financial Code former section 3111 to constrain the actions of the FDIC as receiver, although not in the context of a dispute over the entitlement to future rent after lease disaffirmance.  (See *In re Valley State Bank* (1990) 223 Cal.App.3d 221.)

In any event, we need not resolve whether Financial Code former section 3111 was intended to apply in the context of federally insured failed banks in order to answer the question before us.  Pursuant to the terms of Financial Code former section 3223, the claims limitation of title 12 United States Code section 1821(e)(4) governs over the claims limitation of Financial Code former section 3111, such that Piedmont did not have a claim for future rents as damages following lease disaffirmance.  That being the

28

case, it also had no claim to the collateral that was available in the event of damages arising under the lease.

The trial court erred in concluding otherwise and in entering judgment in favor of Piedmont.[4]

D. *California Uniform Commercial Code Section 5111, Subdivision (e) Attorney Fees:*

(1) *Award in Favor of Piedmont—*

California Uniform Commercial Code section 5111, subdivision (e)[5] provides: "Reasonable attorney's fees and other expenses of litigation must be awarded to the prevailing party in an action in which a remedy is sought under this article." Here, California Bank based one of its causes of action against Piedmont on section 5110, subdivision (a). After the judgment awarded Piedmont costs as the prevailing party, Piedmont filed a motion for attorney fees pursuant to section 5111, subdivision (e). The court granted the motion and awarded Piedmont $394,958.21 in attorney fees and costs. Inasmuch as we reverse the judgment, the award of attorney fees and costs in favor of Piedmont must also fall. (*Center for Biological Diversity v. County of San Bernardino* (2010) 188 Cal.App.4th 603, 613, fn. 4.)

---

[4] Because this case turns on the interpretation of title 12 United States Code section 1821(e)(4) and related authorities, we need not address California Bank's causes of action for unfair competition or unjust enrichment. Although it is unnecessary for the resolution of this case, we nonetheless grant Piedmont's unopposed request, made in connection with its unfair competition claim, that we take judicial notice of the Proposition 64 ballot materials attached to Piedmont's January 4, 2013 request for judicial notice. (*Strong v. State Bd. of Equalization* (2007) 155 Cal.App.4th 1182, 1188, fn. 3.) Also, we address California Bank's California Uniform Commercial Code section 5110 cause of action because it may give rise to an entitlement to attorney fees.

[5] All subsequent statutory references are to the California Uniform Commercial Code, unless otherwise specifically stated.

29

*(2) California Bank's Request for Attorney Fees—*

*(a) Introduction*

Section 5110, subdivision (a) provides as follows:  "If its presentation is honored, the beneficiary warrants:  [¶] (1) to . . . the applicant that there is no fraud . . . of the kind described in subdivision (a) of Section 5109; and [¶] (2) to the applicant that the drawing does not violate any agreement between the applicant and beneficiary or any other agreement intended by them to be augmented by the letter of credit."

At trial, California Bank asserted that Piedmont breached both of the section 5110, subdivision (a) warranties.  California Bank adheres to this position on appeal.  In addition, California Bank contends that it is entitled to attorney fees, under section 5111, subdivision (e), as the prevailing party in this action.

Piedmont, however, argues that California Bank has no standing to maintain a cause of action under section 5110, subdivision (a) because it is not the "applicant" within the meaning of that section.  Piedmont also argues that any section 5110, subdivision (a) cause of action is time-barred in any event.  Finally, it contends that California Bank's substantive claims under section 5110, subdivision (a) have no merit.  We look at these arguments in turn.

*(b) Standing*

As we have seen, the warranties at issue under section 5110, subdivision (a) run in favor of the "applicant."  Section 5102, subdivision (a)(2) defines an "applicant" as "a person at whose request or for whose account a letter of credit is issued[,]" including "a person who requests an issuer to issue a letter of credit on behalf of another if the person making the request undertakes an obligation to reimburse the issuer."  Piedmont emphasizes that inasmuch as Alliance Bank was the one who requested Union Bank to issue the letter of credit, Alliance Bank was the "applicant" within the meaning of sections 5102, subdivision (a)(2) and 5110, subdivision (a).  It also points out that just as

California Bank was not a party to the applicant-issuer relationship, it also was not a party to the applicant-beneficiary relationship, inasmuch as it did not assume the lease, and was not a party to the issuer-beneficiary relationship. Consequently, Piedmont contends, California Bank cannot be characterized as the "applicant" for the purposes of the section 5110, subdivision (a) warranties. We disagree.

Pursuant to title 12 United States Code section 1821(d)(2)(A), the FDIC as receiver succeeded to "all rights, titles, powers, and privileges" of Alliance Bank. By definition, then, upon appointment as receiver of Alliance Bank, the FDIC was endowed with the same powers as Alliance Bank with respect to the $500,000 deposit and the contracts bearing upon that deposit and the letter of credit arrangement. In other words, it stepped into the shoes of the applicant, within the meaning of sections 5102, subdivision (a)(2) and 5110, subdivision (a).

The FDIC thereafter assigned the deposit to California Bank pursuant to the Purchase and Assumption Agreement between those two entities. On appeal, California Bank and Piedmont present a most modest discussion of the relevant provisions of the 106-page Purchase and Assumption Agreement. However, California Bank does observe that, under section 3.1 of the Purchase and Assumption Agreement, it acquired all of the FDIC's "right, title, and interest" in and to the $500,000 deposit. We also observe that under section 3.1, California Bank generally acquired assets from the FDIC "subject to all liabilities for indebtedness collateralized by Liens affecting such Assets . . . ." In the context before us, we interpret this to mean that California Bank acquired all of the FDIC's right, title, and interest in and to the $500,000 deposit subject to any claims, valid or otherwise, arising out of the letter of credit arrangement. This is consistent with Piedmont's view, albeit based on different reasoning, that California Bank acquired what Piedmont calls an "encumbered" asset.

31

Given the nature of the assignment from the FDIC to California Bank, we further conclude, as California Bank urges, that California Bank stepped into the shoes of Alliance Bank as the applicant within the meaning of sections 5102, subdivision (a)(2) and 5110, subdivision (a). An ""'"assignment merely transfers the interest of the assignor. The assignee 'stands in the shoes' of the assignor, taking his rights and remedies, subject to any defenses which the obligor has against the assignor prior to notice of the assignment." [Citation.] Once a claim has been assigned, the assignee is the owner and has the right to sue on it. [Citations.] In fact, once the transfer has been made, the assignor lacks standing to sue on the claim. [Citation.]'" (*Searles Valley Minerals Operations Inc. v. Ralph M. Parsons Service Co.* (2011) 191 Cal.App.4th 1394, 1402, italics omitted.) Put another way, unless a contrary intention is shown, an assignment "'vests in the assignee the assigned contract or chose and all rights and remedies incidental thereto. [Citation.]'" (*Fink v. Shemtov* (2012) 210 Cal.App.4th 599, 610.) Here, just as California Bank took title to the $500,000 deposit subject to any claims of Piedmont and Union Bank, it also acquired the incidental right to defend its interests in the deposit by bringing a breach of warranty claim against Piedmont under section 5110, subdivision (a).

Piedmont challenges this conclusion, saying California Bank has cited no authority that applies these general assignment principles to elevate an assignee to the status of an "applicant" for the purposes of section 5110, subdivision (a). True enough. Indeed, neither party cites a case on point. However, California Bank does cite cases showing that general assignment principles are applied in the context of letter of credit issues, including those arising under the California Uniform Commercial Code. (See *Bd. of Trade of San Francisco v. Swiss Credit Bank* (9th Cir. 1984) 728 F.2d 1241; *Export-Import Bank of the United States v. United Cal. Disc. Corp.* (C.D. Cal. 2010) 738

F.Supp.2d 1047.) Piedmont has offered no convincing reason why they should not be applied in the context before us.

### (c) Statute of limitations

Section 5115 provides: "An action to enforce a right or obligation arising under this article must be commenced within one year after the expiration date of the relevant letter of credit or one year after the cause of action accrues, whichever occurs later. A cause of action accrues when the breach occurs . . . ."

According to Piedmont, any breach of warranty under section 5110, subdivision (a) occurred no later than June 26, 2009, when Union Bank received Piedmont's sight draft. However, California Bank did not file its lawsuit until June 29, 2010. So, Piedmont says, California Bank's lawsuit was untimely, as having been filed more than one year after any breach occurred.

This argument ignores the language of both section 5110, subdivision (a) itself and the official comments thereto. The first clause of section 5110, subdivision (a) states that the beneficiary makes certain warranties "[i]f its presentation is honored." It does not state, as Piedmont would have it, that the warranties are made when the beneficiary presents its draw. Rather, as official comment No. 1 to section 5110 expressly states, "the warranties in subsection (a) are not given unless a letter of credit has been honored . . . ." (Official Comments on U. Com. Code, 23B Pt. 1 West's Ann. Cal. U. Com. Code (2002 ed.) foll. § 5110, p. 241.) Furthermore, official comment No. 2 states that if a "beneficiary drew in violation of its authorization, then *upon honor of its draw* the warranty would be breached." (Official Comments on U. Com. Code, 23B Pt. 1 West's Ann. Cal. U. Com. Code (2002 ed.) foll. § 5110, p. 242, italics added.) If the first clause of section 5110, subdivision (a) were not sufficiently clear, the comments certainly are. The section 5110, subdivision (a) warranties are not breached until honor of the draw.

33

In the matter before us, Union Bank honored Piedmont's draw on July 1, 2009. This being the case, California Bank's lawsuit filed on June 29, 2010 was timely filed.

Piedmont would like us to conclude that, the language of the statute and the official comments thereto notwithstanding, the one-year limitations period with respect to California Bank's claim was triggered on the date of presentation because California Bank is bound by certain wording used in its first amended complaint. In its first amended complaint, California Bank alleged that "Piedmont wrongfully presented the letter of credit to Union Bank in violation of . . ." section 5110, subdivision (a). In its trial brief, California Bank clarified that Piedmont breached the section 5110, subdivision (a) warranties.

Piedmont acknowledges that California Bank argued before the trial court that the breach occurred when Union Bank honored the draw. However, Piedmont focuses on the language of the first amended complaint, and argues California Bank is bound by its statement indicating that the wrong occurred on presentation. However, Piedmont's authorities (see, e.g., *Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271 [party bound by factual admissions]) do not support this argument. California Bank did not make factual admissions to which it must be bound. Rather, it simply used some inartful wording in presenting its legal argument—argument that was not directed at the statute of limitations in any event. California Bank did not concede that section 5115 should be construed as meaning the statute of limitations began to run on the date of presentation, rather than the date of honor.

*(d) Section 5110, subdivision (a) warranties*

Finally, we turn to the substantive question of whether Piedmont breached either of the warranties under section 5110, subdivision (a). As it turns out, we need only address the warranty under section 5110, subdivision (a)(2).

34

In doing so, we ask whether Piedmont breached a warranty "to the applicant that the drawing [did] not violate any agreement between the applicant and beneficiary or any other agreement intended by them to be augmented by the letter of credit." (§ 5110, subd. (a)(2).) In other words, our inquiry is whether Piedmont's draw violated any agreement between itself and Alliance Bank or any other agreement intended by Piedmont and Alliance Bank "to be augmented by the letter of credit." (§ 5110, subd. (a)(2).)

That being the case, a review of the lease between Piedmont and Alliance Bank is in order. Pursuant to the second amendment to the lease, Alliance Bank was required to increase its security deposit by $500,000. Alliance Bank had the choice of providing the additional security deposit either in the form of cash or in the form of a $500,000 unconditional letter of credit.[6] As we know, Alliance Bank chose to provide the letter of credit.

Paragraph 7 of the lease provided that upon the default of Alliance Bank under the lease, Piedmont had the right to "use, apply or retain all or any part of the Security Deposit for the payment of any rent or any other sum in default, . . . or to compensate [Piedmont] for any loss or damage which [Piedmont might] suffer by reason of [Alliance Bank's] default."[7] So, paragraph 7 permitted Piedmont to make use of the

---

[6]     Section 5, subsection (b)(ii) of the second amendment to the lease required the letter of credit to be "payable at sight upon presentment to a . . . branch of the issuer of a simple sight draft stating only that [Piedmont was] permitted to draw on the Letter of Credit under the terms of the Lease and setting forth the amount that [Piedmont was] drawing[.]"

[7]     According to paragraph 22, subparagraph (a) of the lease, defaults included, without limitation, Alliance Bank's abandonment of the premises, the failure of Alliance Bank to pay rent when due, or the appointment of a receiver to take possession of Alliance Bank's assets at the premises or interest in the lease, where possession is not reinstated within 30 days.

security as compensation for any damage it suffered due to the default of Alliance Bank. Piedmont claimed the damage suffered was for future rents, and indeed there appears to be no other viable ground for making a claim to the security.

However, as we have already addressed at length, and notwithstanding the protestations of Piedmont, title 12 United States Code section 1821(e)(4)(B) provides that the landlord under a disaffirmed lease shall "have no claim for damages under any acceleration clause or other penalty provision in the lease . . . ." That being the case, Piedmont had no right to claim future rents as damages owing under the lease. Consequently, Piedmont had no right under the lease to draw upon the letter of credit. In short, Piedmont violated the terms of the lease between itself and Alliance Bank when it made its draw in a manner not authorized by paragraph 7 of the lease, as construed in accordance with the law. Piedmont thus breached its warranty to the applicant under section 5110, subdivision (a)(2).

*(e) Conclusion*

California Bank, as the assignee of the FDIC as receiver of Alliance Bank, had standing to maintain a cause of action against Piedmont for breach of warranty under section 5110, subdivision (a). The undisputed facts demonstrate that, as a matter of law, Piedmont violated the terms of the lease between itself and Alliance Bank when it drew upon the letter of credit based on a claim for future rents that was not permitted under the law. Thus, California Bank is the prevailing party on its section 5110, subdivision (a)(2) cause of action and is entitled to an award of reasonable attorney's fees and other expenses of litigation under section 5111, subdivision (e).

36

## III

## DISPOSITION

The request for judicial notice is granted.  The judgment is reversed and the matter is remanded for further proceedings consistent with this opinion.  California Bank is entitled to its costs on appeal.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.

37