Filed 7/14/21  Sugarman Family Partners v. Banc of Cal. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| SUGARMAN FAMILY PARTNERS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>BANC OF CALIFORNIA, INC.,<br><br>Defendant and Respondent. | G059219<br><br>(Super. Ct. No. 30-2018-00981603)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Martha K. Gooding, Judge.  Affirmed.

Law Office of Thomas E. Elenbaas and Thomas E. Elenbaas for Plaintiff and Appellant.

Morrison & Foerster, Mark R. McDonald, Matthew E. Ladew and James R. Sigel, for Defendant and Respondent.

\*          \*          \*

Sugarman Family Partners (Sugarman Partners) appeals from the judgment entered against it on its claims for specific performance of a warrant contract against Banc of California, Inc. (BofC), and for damages. Sugarman Partners alleges that as the assignee of a warrant to purchase shares in BofC, it was entitled to receive voting shares, and that BofC violated the terms of the warrant by issuing nonvoting shares.

BofC moved for summary judgment because Sugarman Partners's assignor, The Steven and Ainslie Sugarman Trust (the Trust), had made an irrevocable election to exercise the warrant for purchase of nonvoting shares in BofC before entering into the assignment agreement with Sugarman Partners. The trial court agreed and granted the motion.

Sugarman Partners argues the court erred because BofC failed to disclose the Trust's irrevocable election in its public filings related to the warrant, and Sugarman Partners claims that as a "public investor," it was entitled to rely upon those filings in deciding to purchase the warrant. It asserts that BofC is consequently bound by the status of the warrant as disclosed in the public filings and must issue shares in a manner consistent with what was disclosed.

We find no error and affirm the judgment.

This is a contract action to enforce the warrant; it is therefore governed by California contract law. Sugarman Partners stands in the shoes of its assignor, the Trust, and is bound by the actions the Trust took in connection with the warrant before the assignment. In order to prevail here, Sugarman Partners would have to demonstrate the irrevocable election made by the Trust was unenforceable against the Trust, and thus that Sugarman Partners, which stands in its shoes, was likewise free to disregard it. Sugarman Partners has failed to raise a triable issue on that point.[1]

_____

[1] Sugarman Partners also asserts the trial court erred by concluding its cross-motion for summary adjudication on its cause of action for specific performance was moot. But that assertion is dependent on the argument the court erred by granting

2

## FACTS

Steven Sugarman was BofC's president and CEO from 2012 to January 2017.  Steven[2] and his wife are the cotrustees of the Trust.

The Trust held a warrant entitling it to purchase a total of 960,000 shares of stock in BofC, in groups ("tranches") over a period of time, with the right to purchase each tranche expiring five years after the right vested.[3]  Under the terms of the warrant, the shares that the Trust acquired would be "Class B Non-Voting Common Stock."  To exercise the right of purchase under the warrant, the Trust would deliver to the company a "Form of Subscription" document.  However, the terms of the warrant also allowed it to be transferred to third parties in a "'Widely Dispersed Offering,'" and if that was done, the third party assignees of the warrant would be allowed to acquire "shares of Voting Common Stock in lieu of shares of Class B Common Stock."[4]

---

BofC's motion.  Because we find no error in that ruling, we likewise conclude the cross-motion is moot.

[2]  Several participants in the events underlying this dispute share the Sugarman surname.  For clarity, we refer to the individuals by their first names.  No disrespect is intended.

[3]  The original "investor" warrant was issued in 2010 to an entity named COR Advisors, LLC—which was owned and controlled by Steven—as part of a recapitalization of BofC.  In order to comply with banking regulations, the warrant was structured so the initial holder could exercise it only for nonvoting shares.  In August 2012, COR Advisors LLC assigned a portion of that warrant—representing the right to purchase 960,000 shares—to the Trust, which is controlled by Steven and his wife.  BofC processed that assignment by issuing a new warrant in favor of the Trust, for the right to purchase 960,000 shares of nonvoting stock.  It is that warrant which is at issue in this case.

[4]  A "'Widely Dispersed Offering'" was defined to include any transfer in which the recipient did not receive, and did not end up as beneficial owner of, more than a specified percentage of voting shares.  As explained by Steven, the provision restricting the original warrant holder to the purchase of non-voting shares was required by "regulations relating to thrift and bank holding companies . . . to ensure the holder did not inadvertently assume control over the Company."  Similarly, restricting the purchase of

3

In August 2016, while he was still the president and CEO of BofC, Steven caused the Trust to exercise its right to purchase all 480,000 shares of stock governed by the warrant. He did so by submitting a modified version of the Form of Subscription document, titled "Subscription–Irrevocable Election" (SIE). The language of the SIE reiterates that it is irrevocable and intended to be in compliance with "Rule 10b5-1(c)." The document otherwise specifies that the Trust is presently electing to purchase the 480,000 shares of stock pursuant to the terms of the warrant, "with such election made now but effective in parts as of the last date the Warrant may be exercised with respect to any particular Warrant shares." The SIE sets forth a schedule reflecting that the exercise is effective as of September 30, 2017, for 90,000 shares, is effective as of December 31, 2017, as to 130,000 shares, is effective as of March 31, 2018, as to 130,000 shares, and effective as of June 30, 2018, as to 130,000 shares. It states that BofC "shall deliver . . . Class B Common Stock."

The SIE also specifies the Trust will purchase these shares in a "cashless" transaction, meaning the purchase price will be satisfied by BofC retaining a portion of the shares that the Trust was otherwise entitled to acquire. Finally, the SIE requires that the warrant be surrendered to BofC: "[i]f the original Warrant is not surrendered in connection with the exercise hereof," the Trust will (a) indemnify BofC for any loss or damages it might incur in connection with the Trust's failure to do that, and (b) promptly deliver the Warrant to BofC "as promptly as reasonably practicable . . . (and in any event within five (5) business days)." Pursuant to the SIE, the Trust received the first tranche of 90,000 nonvoting shares in BofC in September 2017.

On December 27, 2017, 15 months after the Trust entered into the SIE, and 11 months after Steven left his position at BofC, the Trust entered into an agreement with

---

voting shares under the warrant to those assignees who obtained their interest in a "'Widely Dispersed Offering'" was intended to "ensur[e] the exercise of warrants by the transferee did not cause the transferee to take voting control of the Company."

Sugarman Partners—whose principal was Steven's father, Michael—for purchase of the tranche of 130,000 warrant shares that were due to expire on December 31, 2017.

According to Michael, when Steven asked him if he was interested in purchasing the warrant shares owned by the Trust, Steven provided him with a copy of the warrant, which Michael reviewed and Steven informed Michael that if the transfer of the warrant qualified as a widely dispersed offering, the recipient would be entitled to receive voting shares.

Michael also claimed that before deciding to purchase the warrant shares, he reviewed BofC's public securities filings relating to the warrant, which stated that "the warrants are exercisable for voting common stock in lieu of non-voting common stock following a transfer of the warrants under certain circumstances described in the terms of the warrants." None of the securities filings made any mention of the election "purportedly signed by the Sugarman Trust." Michael claims he relied on those filings in deciding to purchase the warrant shares.

On December 27, 2017, Sugarman Partners entered into an agreement with the Trust, pursuant to which the Trust assigned to Sugarman Partners "all of the rights of [the Trust] for 130,000 shares exercisable until December 31, 2017 under the attached [warrant]." However, despite the characterization of the warrant as "attached," the agreement also states that the Trust "does not possess" the relevant warrant, without explaining why.[5]

---

[5] The assignment document includes one reference to the warrant which describes it as "attached . . . (subject to the Lost Certificate Affidavit)," but no such affidavit is in our record. By contrast, the document Michael signed to exercise Sugarman Partners's right to purchase the 130,000 warrant shares includes a promise to deliver the original warrant: "If the original Warrant is not surrendered in connection with the exercise hereof; (i) the undersigned represents that it has not sold, assigned, pledged, transferred, hypothecated, or otherwise disposed of the original Warrant or any interest therein or represented thereby and hereby agrees to fully and forever indemnify and hold harmless the Company and each of its successors, assigns, and affiliates from any loss, cost, damages, or expense (including reasonable attorneys' fees) or any kind or

Sugarman Partners paid $1,640,000 to the Trust for the assignment. It also executed a subscription for the shares, instructing BofC to issue voting shares in a cashless transaction. Steven's attorney then submitted both the assignment and the subscription to BofC prior to the deadline. In response to the submission, BofC issued 77,413 shares of nonvoting stock to Sugarman Partners.

In March 2018, Sugarman Partners filed its complaint against BofC, seeking "specific performance of a warrant for the acquisition of shares of common stock, or alternatively, damages for breach of said warrant." The operative second amended complaint seeks the same relief.

Thereafter, despite knowing that BofC was taking the position it could only issue nonvoting shares under the Trust warrant (and after filing this lawsuit), Sugarman Partners chose to purchase two more tranches of 130,000 warrant shares, the first on March 30, 2018, and the second on June 29, 2018.[6]

In April 2019, BofC moved for summary judgment, arguing it fully complied with its obligations under the warrant by issuing the Class B shares that Sugarman Partners's predecessor had irrevocably elected to receive.

---

nature whatsoever it may hereinafter suffer or incur in connection with or as a result of the undersigned's failure to surrender the original Warrant in connection with such exercise; and (ii) the undersigned will as promptly as reasonably practicable after the delivery of this Subscription to the Company (and in any event within five (5) business days), deliver, or cause to be delivered, the original Warrant to the Company."

[6] The operative complaint, which was filed after Sugarman Partners agreed to purchase the third tranche of warrant shares, alleges Sugarman Partners bought all the shares in reliance on the representation in BofC's public filings that the warrant would be exercisable for voting shares if obtained in a widely dispersed offering. Sugarman Partners concedes it was already aware, by the time it purchased the second and third tranches, that BofC would refuse to issue voting shares under the warrant, and alleges it consequently "deferred" a portion of the price it agreed to pay the Trust for those tranches, "until voting common stock was issued."

In its opposition to summary judgment, Sugarman Partners claimed that before it agreed to the assignment, both Steven and Michael had reviewed BofC's public filings relating to the warrant to confirm they stated the warrant could be exercised for voting shares after a widely dispersed offering. It pointed out that with respect to a different warrant owned by Jason Sugarman, BofC's public disclosures revealed that Jason Sugarman had "'irrevocably elected to fully exercise each tranche,'" while making no similar disclosure relating to the Trust's warrant.

Sugarman Partners argued that Steven never believed the SIE would prevent the Trust from thereafter selling the warrant shares in a widely dispersed offering. In a declaration, Steven claimed that when he agreed to the SIE, he was assured it was essentially a formality to ensure that he would not be precluded from exercising the Trust's right to purchase warrant shares during a "'black-out' period" when insiders were precluded from trading in BofC's stock. He stated he was told the document would be effective "should [he] continue to own the Warrant securities as of the date of the exercise," but that it "could be cancelled or amended, or [he] could earlier exercise or transfer the Warrants per [their] terms" if "the Company was in an 'open trading window.'"

Sugarman Partners argued there were triable issues of fact as to the enforceability of the Trust's irrevocable election because the SIE was signed by Steven alone, and the terms of the Trust require that unless otherwise specified, "'the signatures of all Co-Trustees shall be required to evidence the exercise of any trustee power.'"

Sugarman Partners also filed a cross-motion seeking summary adjudication in its favor on its specific performance cause of action. It argued the SIE was ineffective to amend the warrant in a way that precluded its sale in a widely dispersed offering.

The trial court granted BofC's motion for summary judgment. It reasoned the SIE unambiguously stated that the Trust was exercising its option to purchase all 480,000 of Class B shares covered by the warrant, on the dates specified. It noted that

7

the word "irrevocable" was used four times in the document.  The court also concluded that that none of the extrinsic evidence submitted by Sugarman Partners demonstrated the Election was reasonably susceptible of the interpretation urged by Sugarman Partners, which was that the Trust's election was revocable and effectively preserved its option to later transfer the unexercised warrant to a third party in a widely dispersed offering.

In light of that ruling, the court denied Sugarman Partners's motion for summary adjudication on the ground it was moot.

## DISCUSSION

1.      *The Effect of Federal Securities Laws*

Sugarman Partners's primary argument is that the trial court erred by ignoring the impact of federal securities laws on this case.

Sugarman Partners characterizes itself as a "public investor" in BofC's stock; it argues that as a consequence, its right to rely on the public filings of BofC is a "bedrock principle of United States securities laws and the operation of the free market." In light of that principle, Sugarman Partners claims BofC cannot rely on a "private contract" to "amend[] or alter[] all of the many publicly filed SEC disclosures . . . concerning the warrant."

Sugarman Partners argues the summary judgment must be reversed "to restore public investor trust in the ability to rely on public company SEC filings and SEC disclosures in the State of California" and claims it is "[s]hocking" that the trial court "made no mention whatsoever of [the] SEC filings in its minute order granting . . . [the] motion."  According to Sugarman Partners, "[t]he trial court effectively has overturned more than a hundred years of law concerning an innocent purchaser's ability to rely on public SEC disclosures to protect its value when purchasing a public security described in a public registration statement from a public company."

8

We note Sugarman Partners never offered this expansive argument to the trial court; nor did it cite any authority to support such a position. For that reason alone, we are inclined to disregard it. "The general rule is that a party to an action may not for the first time on appeal change the theory upon which the case was tried." (*Curcio v. Svanevik* (1984) 155 Cal.App.3d 955, 960.) "'[I]f the new theory contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial the opposing party should not be required to defend against it on appeal.'" (*Adelson v. Hertz Rent-A-Car* (1982) 133 Cal.App.3d 221, 225-226, citing *Panopulos v. Maderis* (1956) 47 Cal.2d 337, 341.)

In any event, we find the argument flawed. This is not an action for enforcement of securities laws, or a securities fraud case.[7] This is a breach of contract case, and Sugarman Partners is suing to enforce rights it has as the assignee of the Trust.

---

[7] None of the cases cited by Sugarman Partners in support of its securities law argument is similar to this one. None relies on an alleged violation of federally mandated public disclosures as a basis for refusing to enforce a contract under state law; nor do any of them suggest such a remedy might be available. (See *California Public Employees' Retirement System v. ANZ Securities, Inc.* (2017) 582 U.S. ___, ___ [lawsuit alleging securities fraud under 15 U.S.C. § 77(a) et seq.]; *Matrixx Initiatives, Inc. v. Siracusano* (2011) 563 U.S. 27 [lawsuit alleging securities fraud under 15 U.S.C. § 78j(b)]; *In re Facebook, Inc., IPO Securities & Derivative Litigation* (S.D.N.Y. 2013) 986 F.Supp.2d 428, 465 [consolidated class action alleging violations of various federal securities laws]; *In re Initial Pub. Offering Sec. Litig.* (S.D.N.Y. 2003) 241 F.Supp.2d 281, 299 [lawsuit alleging market manipulation in violation of federal securities laws]; *Kronfeld v. Trans World Airlines, Inc.* (2d Cir. 1987) 832 F.2d 726; [class action lawsuit alleging violations of federal securities laws]; and *Oran v. Stafford* (3d Cir. 2000) 226 F.3d 275, 286 [same].)

We express no opinion about whether Sugarman Partners might be able to state any cause of action under federal securities laws based on its failure to publicly disclose the irrevocable election, or might be eligible for some remedy against BofC in connection with such a claim. We conclude only that it did not allege any such claim here.

9

For purposes of enforcing that contractual right, Sugarman Partners stands in the shoes of the Trust and is bound by whatever actions the Trust took in connection with the contract. "An ""assignment merely transfers the interest of the assignor. The assignee "stands in the shoes" of the assignor, taking his rights and remedies, subject to any defenses which the obligor has against the assignor prior to notice of the assignment.""" (*California Bank & Trust v. Piedmont Operating Partnership, L.P.* (2013) 218 Cal.App.4th 1322, 1347.)

Given its status as the assignee of the Trust, Sugarman Partners cannot claim to be "a third-party investor who was not a party to either contract, had no knowledge of the non-public information between [BofC] and its CEO," and whose only source of information about the warrant was the content of publicly available filings.

The defect in Sugarman Partners's security law argument is reflected in its assertion that the trial court erred by concluding "the publicly filed registration statement and prospectus for the warrants [citation omitted] was somehow modified by a private agreement between *a non-party* and [BofC] even though that private agreement was never publicly disclosed nor were the public filings ever amended." In effect, Sugarman Partners asserts the Trust is a stranger to the warrant and it is therefore unfair to allow the Trust's conduct to affect any rights that exist under it.

We disagree with this view. Sugarman Partners's standing in this case is derived from its status as the assignee of the Trust—the same "nonparty" Sugarman Partners dismisses in its critique of the court's decision. Because Sugarman Partners stands in the shoes of the Trust for purposes of enforcing its assigned right to purchase shares pursuant to the warrant, it can only prevent summary judgment by demonstrating either (1) the trial court's interpretation of the SIE was erroneous, or (2) there are triable issues of fact concerning whether the election is unenforceable even as against the Trust. We consequently turn to those issues.

10

2.    *Contractual Argument*

Sugarman Partners argues the trial court erred in its interpretation of the SIE, criticizing it for "fail[ing] to adhere to the standards for the interpretation of a contract." It claims the trial court "disregarded the totality of the circumstances under which the [SIE] was adopted [including BofC's] representations in its multiple SEC filings which repeatedly reaffirmed the ability of the . . . Trust to make a transfer of warrants in a widely dispersed offering." Sugarman Partners notes the trial court's order explicitly acknowledges its obligation to consider the evidence, but asserts the court nonetheless "ignored" that standard. Again we must disagree.

Interpretation of a contract is a question of law to be resolved by the court which must (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18.) ascertain the objective intent of the parties as shown by the words of the contract. (*Lloyd's Underwriters v. Craig & Rush, Inc.* (1994) 26 Cal.App.4th 1194, 1197-1198; see also Civ. Code, § 1639 [when a contract is reduced to writing, the parties' intent "is be ascertained from the writing alone, if possible"].) "'Courts must interpret contractual language in a manner which gives force and effect to every provision, and not in a way which renders some clauses nugatory, inoperative or meaningless."' (*Ratcliff Architects v. Vanir Construction Management, Inc.* (2001) 88 Cal.App.4th 595, 602.)

As the trial court observed, the words used in the SIE are clear. They specify the Trust is making an "irrevocable election" to purchase 480,000 shares of stock, in four tranches, effective in parts on the last date the warrant may be exercised as to each tranche. It identifies the warrant shares to be delivered are "480,000 of Class B Common Stock" and "0 shares of Voting Common Stock." It also obligates the Trust to deliver the original warrant to BofC.

Thus, on its face, the SIE reflects the Trust's exercise of its right to purchase shares pursuant to the warrant. However, under the well-settled "PG&E rule" (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37-40

11

(*PG&E*), courts must preliminarily consider "all credible evidence offered to prove the intention of the parties" so that courts can place themselves "'in the same situation in which the parties found themselves at the time of contracting.'" (*Id*. at pp. 39-40, 69.) Such evidence is ultimately admissible only if, after considering it, the language of the contract "'is fairly susceptible of either one of the two interpretations contended for . . . .'" (*Id*. at p. 40.) In other words, the PG&E rule allows a party to offer evidence revealing a latent ambiguity in the words used.

The PG&E rule does not supplant the basic rule that parol evidence cannot be relied upon to demonstrate that the parties' actual agreement was inconsistent with the terms they chose. (Code Civ. Proc., § 1856.) Thus, Sugarman Partners cannot rely on BofC's public filings to demonstrate the SIE was intended to be revocable. The language of the contract is not "reasonably susceptible" of that interpretation. The words used in the SIE are clear, and BofC's failure to update its public disclosures does not alter their clarity.

Sugarman Partners claims there is an "inherent conflict" between the designation of the SIE as a Rule 10b5-1 plan and the provisions making it irrevocable. Sugarman Partners relies on both a question-and-answer document produced by the SEC, as well as the "frequently asked questions" document produced by Morrison and Foerster, for the proposition that 10b5-1 plans are revocable. But neither of those documents states that a 10b5-1 plan *must be* revocable. And even if that were the rule, the documents do not establish that labeling a document as a 10b5-1 plan must nullify an explicit provision making it irrevocable, as opposed to disqualifying it as a 10b5-1 plan. We consequently reject the argument.

Sugarman Partners's lament that BofC failed to explain "why" Steven, its former CEO, "would give up an economically valuable right [to sell the warrant to a third party that could use it to obtain voting shares] for no consideration" is irrelevant in ascertaining the effect of the Trust's election. This is a contract action, and the intent of

12

the contract must be ascertained on an objective basis. (*In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 948.) Whether Steven caused the Trust to exercise its contractual right is relevant. His reasons for doing so are not.[8]

But even if we were to agree there was a triable issue of fact about whether the SIE was intended to be revocable, it would not prevent summary judgment in this case. Sugarman Partners would also have to demonstrate there is a triable issue of fact on the question of whether the election actually was revoked. It has not done so. Steven does not claim he ever notified BofC that the Trust was revoking the SIE before it assigned its rights to Sugarman Partners. Such a revocation would be required before the Trust could sell a share of the warrant to Sugarman Partners—i.e., complete a "widely dispersed offering" necessary to authorize the issuance of voting shares—given that the election required the Trust to *surrender* the warrant to BofC.

Following execution of the SIE, the Trust could transfer its rights secured under the terms of the Election—i.e., the contractual right to obtain the shares of Class B nonvoting shares on the designated dates. And the terms of the assignment agreed to between the Trust and Sugarman Partners are consistent with such an intent.

The Trust's assignment to Sugarman Partners states that it is assigning "all of the rights of the undersigned for 130,000 shares exercisable until December 31, 2017." A separate "Securities Purchase Agreement," executed at the same time, states the Trust "agrees to sell and transfer 130,000 of warrant shares . . . that are exercisable into

---

[8] Steven explains his thinking in his declaration. As the president and CEO of BofC, he was subject to periodic "blackout" periods, during which he could not engage in transactions involving BofC stock. Consequently, he was at risk of being "unable to exercise the warrant even though it was highly valuable to do so" if the right to purchase a tranche expired during a blackout period. By entering into a binding election to exercise the options on dates specified in advance—the Rule 10b5-1(c) plan—Steven could ensure his ability to purchase shares under the warrant while insulating himself from an allegation of insider trading.

common stock until December 31, 2017." Both of those documents are consistent with an agreement to sell Sugarman Partners the "Class B common stock" shares the Trust had already elected to receive under the SIE. Thus, submitting those documents to BofC prior to the December deadline would not have served to notify BofC that the Trust intended to revoke its election.

For all of the foregoing reasons, we conclude Sugarman Partners failed to demonstrate any error in the trial court's interpretation of the SIE, or to raise a triable issue of fact on the question of whether that election, even if it were not irrevocable, had actually been revoked.

3.    *Other Enforceability Issues*

Sugarman Partners also contends there is a triable issue of fact about whether Steven, acting alone, had the authority to bind the Trust to the SIE. We are not persuaded.

The Trust agreement states that "[e]xcept as provided elsewhere in the Trust Agreement, the signatures of all Co-Trustees shall be required to evidence the exercise of any trustee power." However, as Sugarman Partners concedes, a separate provision in the agreement explicitly authorizes a single trustee to "exercise or sell stock subscription or conversion rights." Indeed, Steven admits that provision authorizes him, acting alone, to exercise a stock option.

That provision also governs the exercise of the Trust's right to purchase shares under the warrant because "[a] warrant is simply an option to purchase the shares of a corporation at a specified price and for a specified period of time. It differs from an option in that it is issued in the form of a security and is normally intended to be traded in the public market." (*Robert Half Internat., Inc. v. Franchise Tax Bd.* (1998) 66 Cal.App.4th 1020, 1022, fn. 1.)

Although Sugarman Partners attempts to carve out an exception to the provision authorizing a single trustee to exercise a stock option, suggesting it would not

14

apply in situations where the Trust's exercise of an option "devalue[s]" it or "give[s] up a valuable Trust right"—in this case the right to sell the option to a third party instead—it identifies nothing in the agreement to support the creation of such an exception. The exercise of any contractual option devalues the option itself and would necessarily incorporate the relinquishment of the alternative choice. Without more, Sugarman Partners has failed to demonstrate that a triable issue of fact exists regarding whether Steven, acting alone, was authorized to exercise the Trust's right to purchase shares under the warrant.

In any event, even if we were to assume Steven was precluded from exercising a stock option on behalf of the Trust—because doing so involved the relinquishment of a more valuable right—we would conclude Sugarman Partners has not offered any evidence to show the option to sell the warrant in a widely dispersed offering was actually more valuable to the Trust at the time of the SIE.

Instead of making such a showing, Sugarman Partners posits that the option to sell the warrant to a third party is more valuable because the voting shares that would be issued to a third party are inherently more valuable than the nonvoting shares issued to the Trust, since the latter are "not traded on any exchange." But ease of trading does not necessarily correlate to value. Moreover, the claim is belied by Steven's admission that the Trust decided to retain the first tranche 90,000 (nonvoting) shares that came due under the warrant in September 2017, rather than selling those shares to a third party in a widely dispersed offering.

The final contention made by Sugarman Partners is that the Election amounts to a forfeiture of its right to sell the warrant to a third party in a widely dispersed offering. It relies on authority that forfeitures are disfavored, and thus that "[t]he burden is on the party claiming the forfeiture to show that such was the unmistakable intention of the instrument." (*Universal Sales Corp. v. California etc. Mfg. Co.* (1942) 20 Cal.2d 751, 771.) As we have already indicated, the SIE not only reflects the election to purchase *all*

15

the shares covered by the warrant, it explicitly requires the Trust to surrender the warrant itself to BofC.   We conclude those provisions unmistakably reflect an agreement that the Trust would not thereafter attempt to sell the warrant to a third party.

## DISPOSITION

The judgment is affirmed.  Respondent is to recover its costs on appeal.

GOETHALS, J.

WE CONCUR:

O'LEARY, P. J.

MOORE, J.